**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Timothy A. BISHOP, Defendant–
Appellant.**

**No. 00–30044.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 9, 2001

Filed Sept. 6, 2001

Amy Adelson, Dershowitz, Eiger & Adelson, P.C., New York, New York, for the defendant-appellant.

Hugh W. Berry, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

Before: LAY,* TROTT and BERZON, Circuit Judges.

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

LAY, Circuit Judge:

Timothy Alan Bishop was convicted of one count of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 and one count of establishment of a methamphetamine manufacturing operation in violation of 21 U.S.C. §§ 856(a)(1), 856(b), and 18 U.S.C. § 2. He was subsequently sentenced to 188 months imprisonment. On appeal, Bishop argues that the district court erred in finding probable cause to support a search warrant for his residence. Bishop also argues that the district court erred by allowing illegally-seized evidence into evidence and that this error was not harmless. In addition, Bishop argues that his sentence violates the sentencing guidelines. For reasons to be explained, we reverse and remand for a new trial.

## I. BACKGROUND

On January 1, 1999, Robert Holmes was taken into custody by the police after he turned himself in on a warrant related to forgery. At the time, Holmes told the police that he had information regarding Timothy Bishop and a methamphetamine operation Bishop was running out of his home in Washougal, Washington.

Detective John Hess spoke with Holmes by phone and later at the police station regarding his knowledge of the methamphetamine operation. Holmes told Detective Hess, among other things, the following: (1) Bishop had a large-scale methamphetamine manufacturing operation at his residence; (2) Bishop had "cooked" methamphetamine the day before; (3) Bishop had a hidden room in his residence that he used when producing methamphetamine; (4) Bishop used a

storage unit, rented by Holmes but sub-leased to Bishop, to keep chemicals, glass-ware, and books related to the manufac-ture of methamphetamine; (5) there were other individuals involved with Bishop's operation; (6) Bishop used a certain pro-cess to manufacture the methamphet-amine; (7) Bishop drove a blue pick-up truck; (8) Bishop possessed a number of firearms throughout his residence; and (9) Bishop had several ounces of metham-phetamine and a large sum of money at his residence.

Detective Hess attempted to corroborate Holmes' statements by sending officers to check out the storage locker. The officers determined that the storage locker was rented by Robert C. Miller and that T.A. Bishop and Karl Behn were listed as hav-ing access to the locker. Detective Hess questioned Holmes and determined that Robert C. Miller was his alias. While the officers were at the storage facility, they noticed a blue pick-up truck, matching the description given by Holmes, drive up to the gate. The driver of the truck attempt-ed to enter the locked gate, but was unable to do so and left. The officers ran a check on the license plate number and confirmed that it was registered to Bishop with the same address that Holmes had provided them.

Detective Hess decided to apply for a warrant to search Bishop's residence and the storage unit. Before the warrants were obtained, however, he sent a drug task force to secure Bishop's residence, based on his concern that guns were locat-ed in the residence. Detective Hess also instructed officers to make a traffic stop on Bishop's truck and detain him while the residence was secured.

The officers stopped Bishop's truck sev-eral miles from his residence ("Washington stop"). The officers conceded that there was no probable cause for this stop. The officers searched Bishop's truck and found a semi-automatic pistol that they deter-mined was stolen. Bishop was placed un-der arrest for possession of a stolen fire-arm. Detective Hess then proceeded to interrogate Bishop, despite his request for counsel. Scott Youngs, a passenger in Bishop's truck, was also arrested at the time on an outstanding felony warrant.

When the drug task force arrived at Bishop's residence, they knocked loudly on the front door. After no response, they checked the door and found it unlocked. They entered the residence, and as Holmes had reported to Detective Hess, found Bishop's girlfriend in an upstairs bedroom. The task force continued to check the residence for other occupants. While officers were in the home, they ob-served guns, a glass smoking pipe, and a surveillance system. The officers also con-firmed the existence of the secret room that Holmes had revealed to Detective Hess. According to a neighbor, the police were in the home for over two hours.

On January 2, 1999, Detective Hess sought and received a search warrant for Bishop's residence and the storage locker. The warrant affidavit included: (1) state-ments made by Holmes; (2) observations made by officers at the storage locker; (3) observations made by officers during the Washington stop; (4) statements made by Bishop during Detective Hess' interroga-tion at the traffic stop; and (5) observa-tions of the task force when securing the residence.

Detective Hess testified that during the search of Bishop's residence, officers found no evidence that methamphetamine had been cooked in the secret room. There was no chemical odor in the house or in the secret room. The officers did find items consistent with the manufacture of methamphetamine, however, such as a can of lye, starter fluid, and pseudoephedrine

pills. Detective Hess testified at trial that all the items necessary to manufacture methamphetamine were not present in Bishop's home. The officers also found numerous firearms throughout the house. There was no cash found in any of the safes, but a small amount of finished methamphetamine was found in the bedroom.

After the search of the residence and storage unit, Bishop was charged with one count of conspiracy to manufacture methamphetamine, one count of operating an establishment to manufacture methamphetamine, one count of possession of methamphetamine with intent to distribute, and one count of the manufacture of methamphetamine. Bishop pled not guilty to all of the charges.

Youngs was also charged as part of the conspiracy to manufacture methamphetamine. Youngs, however, pled guilty prior to the trial and testified as a Government witness at trial. Holmes, the informant, was not charged but agreed to cooperate with the Government and testify against Bishop at trial.

Prior to trial, Bishop moved to suppress evidence obtained from his residence and the Washington stop. At a suppression hearing, the district court found the Washington stop was unsupported by probable cause or even a reasonable well-founded suspicion of ongoing or imminent criminal activity. The court determined that statements made by Bishop at the time of his arrest could not be used in the search warrant affidavit.

The court further held that the police did not have exigent circumstances to justify the warrantless entry into Bishop's home. As a result, the court suppressed all the evidence secured during the illegal police actions. The court redacted the illegally-obtained information from the warrant affidavit. The court then reviewed the excised affidavit and concluded that probable cause independently existed to issue the search warrant.

Bishop also moved to suppress evidence seized in a traffic stop in Clackamas County, Oregon ("Oregon stop"). On June 15, 1998, Bishop was stopped by Deputy Kevin Layng because he did not have a front license plate on his vehicle. The passenger in Bishop's car was Youngs, but when Deputy Layng asked about the identification of Youngs, Bishop stated that he only knew him as "Scott." Deputy Layng asked Bishop if he could check inside the vehicle for any identification of "Scott."

When Deputy Layng leaned into the vehicle, he noticed a strong chemical odor. Deputy Layng proceeded to look further into the vehicle and found various items related to the manufacture of methamphetamine. These items were a two gallon, clear glass flask with a white powder residue on the neck of the bottle, a glass funnel, and a pump used in methamphetamine laboratories. Bishop was placed under arrest for possession and manufacture of a controlled substance. Deputy Layng asked for permission to search Bishop's vehicle, but Bishop declined. Based on Layng's observations, he performed a warrantless vehicle search. In the trunk of the car were numerous cans labeled lye and five gallon sized buckets with an unknown powder substance in plastic bags. A semi-automatic handgun was also seized. Layng requested a search warrant to relocate the vehicle and further search its contents. The request was granted.

Youngs was then questioned and his true identity was determined. It was discovered that there was an outstanding warrant for Youngs' arrest, and he was taken into custody.[1] The district court

---

1. Although both Youngs and Bishop were placed in custody and were incarcerated in an

denied the motion to suppress and allowed the evidence of the Oregon stop into trial as direct evidence supporting the conspiracy. The court did not limit the evidence under Rule 404(b) of the Federal Rules of Evidence.

After a jury trial, Bishop was found guilty of conspiracy to manufacture methamphetamine and establishment of a methamphetamine operation. The court dismissed the charge of possession with intent to distribute, and the jury acquitted Bishop of the manufacture of methamphetamine. The district court sentenced Bishop to 188 months imprisonment. Bishop now appeals his conviction and sentence.

## II. SEARCH WARRANT

■■■ This court reviews de novo a district court's determination as to whether a search warrant was supported by probable cause. *United States v. McIver*, 186 F.3d 1119, 1128 (9th Cir.1999). The court's underlying findings of fact and determinations of credibility are reviewed for clear error. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Probable cause exists when there is a fair probability or substantial chance of criminal activity. *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). It is well-settled that the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search. *Id.* at 238, 103 S.Ct. 2317.

There should be little doubt, based upon the information given in the search warrant, that the stop of Bishop's vehicle in

the State of Washington was illegal and without probable cause. The incriminating evidence found in the automobile was properly suppressed, and the statements made by Bishop at the scene of the traffic stop were inadmissible under the *Miranda* rule. In addition, the district court held there was no probable cause or exigent circumstances allowing the illegal entry into Bishop's residence and that any of the items discovered in the search were inadmissible.

Once the district court determined that the search warrant included illegally obtained information, it properly purged the affidavit of the offending facts and examined whether the remaining facts still afforded a substantial basis for concluding that the search warrant was supported by probable cause. *See United States v. Grandstaff*, 813 F.2d 1353, 1355 (9th Cir. 1987) (finding that an excised affidavit still afforded the magistrate a substantial basis for concluding that the search warrant would uncover wrongdoing). The remaining facts on the warrant included the details of the Holmes tip and the police's observations at the storage locker. The court then concluded that although it was a "close question," there were still sufficient facts in the affidavit to support the legality of the search warrant.[2]

■■■ When a search warrant is based solely on an informant's tip, the proper analysis is whether probable cause exists from the totality of the circumstances to determine a sufficient level of reliability and basis of knowledge for the tip. *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. The more

---

Oregon jail, all charges, for reasons not explained in the record, were dismissed by the State of Oregon.

2. The Government does not claim that this case falls under the good-faith defense set forth in *United States v. Leon*, 468 U.S. 897,

104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). When the warrant was secured in part on the basis of unlawfully seized evidence, the good-faith defense does not apply. *See United States v. Wanless*, 882 F.2d 1459, 1466–67 (9th Cir.1989).

flexible test of "totality of the circumstances" can be reviewed by reference to the standards outlined in *Aguilar v. State of Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). However, as the *Gates* Court points out, the rigid two-prong test from *Aguilar* and *Spinelli* is no longer applied as independent factors, but instead the factors are intertwined such that a common sense, practical approach of the totality of circumstances must take place. *See Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

■ One of the factors that courts consider in reviewing the totality of the circumstances is the informant's basis of knowledge. When considering the basis of knowledge, courts look for "how the informant came by his or her knowledge." *United States v. Angulo–Lopez,* 791 F.2d 1394, 1396 (9th Cir.1986). In this case, the district court found that Holmes' information was not based on hearsay, but came from first-hand knowledge. The court accepted Holmes' claim that while at Bishop's home he observed methamphetamine packaged for sale and twenty or thirty thousand dollars in cash. He also told Detective Hess that Bishop had a secret room where Bishop had cooked methamphetamine "yesterday" and was probably cooking today. The court concluded that Holmes was speaking from first-hand knowledge about Bishop's methamphetamine activities and we agree.

■ The veracity of an informant's information is also considered when reviewing the totality of the circumstances. The courts may employ a number of methods to determine if an informant's information is reliable. It may be demonstrated through independent police corroboration of the information provided by an informant. *See United States v. Freitas,* 716 F.2d 1216, 1222 (9th Cir.1983). It may also be established by admission against penal interest. *See United States v. Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

Bishop asserts that while Holmes' claim of personal knowledge might satisfy the basis of knowledge requirement, it has nothing to do with the veracity or accuracy of Holmes' information. Bishop argues, after the fact, that Holmes was not a reliable informant because his testimony at trial contradicted many of the statements that he gave to Detective Hess. However, we note that these contradictions were not raised at the suppression hearing. It was incumbent on Bishop at the suppression hearing to show that not only were Holmes' hearsay statements false, but that the affiant, Detective Hess, knew they were false. *See Franks v. Delaware,* 438 U.S. 154, 155, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The most incriminating statement against Bishop in Detective Hess' affidavit was that Holmes stated that Bishop had "cooked" the day before he met with Detective Hess. Yet later at trial, Holmes admitted this was not true, although he admitted he had stated this fact to Detective Hess.[3] While we acknowledge the contradictions in Holmes' testimony, there was no reason at the time the warrant was issued for Detective Hess to believe they were false and thus no reason to challenge the statements, either then or now.

■ Bishop also argues that Holmes was not a reliable informant because he

---

**3.** This may account for the jury acquittal of Bishop of the one count of the manufacture of methamphetamine.

had an ulterior motive for turning in Bishop. Bishop points out that Holmes readily admitted at trial (he did not testify at the suppression hearing) that he turned himself in to incriminate Bishop out of spite. According to Holmes, he was a drug addict, and Bishop had aided him in the past, as a friend, by giving him cash. In late December 1998, however, Bishop refused to help Holmes after he had allegedly been locked out of his apartment because he could not pay the rent. It was at that time that Holmes turned Bishop in and reported his methamphetamine activities. That Holmes' action may have been motivated by spite, is not enough to undermine the credibility of his statements to Detective Hess. As we explained in *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir.1988), "[i]t would have to be a very naive magistrate who would suppose that a confidential informant would drop in off the street with such detailed evidence and not have an ulterior motive."

At the suppression hearing, the district court never explored Holmes' motivation for giving the statements to Detective Hess. Instead, the court simply concluded that Holmes was a credible informant because the statements he provided were an admission against penal interest. Bishop contends, however, that Holmes never actually incriminated himself with respect to Bishop's methamphetamine activities, but instead turned himself in on an unrelated forgery charge.

■ Although Holmes' statements may raise suspicions as to his involvement with Bishop, we find it unnecessary to pass on the district court's finding that Holmes' statements were an admission against penal interest. We find alternative grounds to uphold the district court's finding of reliability to establish probable cause. Under *Gates*, viewing the totality of the circumstances, the police did have sufficient corroborative evidence to find Holmes was a reliable informant.

■ While the informant in *Gates* was anonymous, and in the present case the informant was known by the police, the corroborative facts here parallel those disclosed in *Gates* such that "it suffices for the practical, common-sense judgment called for in making a probable-cause determination." 462 U.S. at 244, 103 S.Ct. 2317. Here, there was corroboration through other sources of information sufficient to corroborate the veracity of the informant.[4] We hold that the district court had a substantial basis to believe that a search of Bishop's residence would discover evidence of wrongdoing. As *Gates* reminds us, probable cause does not demand the certainty we associate with formal trials. *Id.* at 246, 103 S.Ct. 2317.

Therefore, based on the evidence adduced at the suppression hearing and corroboration of certain factual details, we uphold the search warrant for Bishop's residence and the storage unit based upon the redacted affidavits.

4. Holmes told Detective Hess about the storage unit which, although in his name, he had subleased to Bishop, who allegedly possessed the only key to enter it. The location of the storage unit was verified by the police. The police checked out the storage unit and found there was no sublease on file with the storage owners and the storage unit was registered in the name of Robert K. Miller. However, there was a notation that both Bishop and an individual by the name of Kehn were given permission to use it. Holmes explained that Robert K. Miller was an alias. While at the storage unit, the police did not seek Holmes' consent to search the storage unit, but simply located the unit. However, as stated, while the police were at the storage facility, they verified that Bishop's truck came to the gate of the warehouse area, but could not enter.

## III. THE 1998 OREGON TRAFFIC STOP

 We now turn to the more troublesome area concerning drug items seized and admitted into evidence at the trial itself. On June 15, 1998, Bishop and Youngs were involved in a traffic stop and subsequently arrested in the State of Oregon.[5] The trial court found that the evidence seized in the Oregon stop was relevant to the overall conspiracy to manufacture methamphetamine.[6] The evidence seized was not admitted under Rule 404(b) of the Federal Rules of Evidence, but as direct evidence at the trial itself.

Bishop argues that the June 1998 stop of his car in Oregon was invalid, and as such the district court erred by not suppressing the evidence seized during the search of Bishop's car. The Government now *concedes* that the 1998 search was illegal. *See United States v. Twilley*, 222 F.3d 1092 (9th Cir.2000).[7] In *Twilley*, this court found that an officer did not have reasonable suspicion to stop a car bearing only a rear license plate simply because he erroneously believed the law required both a front and rear license plate. *Id.* at 1096. Nonetheless, the Government argues that the error committed by the district court was not prejudicial because the evidence was cumulative to other independent evidence presented at trial regarding Bishop's criminal activity.

 On direct appeal, we apply the harmless-error rule of *Chapman v. California*, which requires the error to be "harmless beyond a reasonable doubt." 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[8] This court must be convinced that the improperly admitted evidence did not contribute to the verdict. *See United States v. Lucas*, 963 F.2d 243, 246 (9th Cir.1992). "Review for harmless error requires not only an evaluation of the remaining incriminating evidence in the record, but also the most perceptive reflections as to the probabilities of the effect of [the] error on a reasonable trier of fact." *United States v. Harrison*, 34 F.3d 886, 892 (9th Cir.1994) (citations omitted).

The Government argues that the admission of the evidence from the Oregon stop was harmless in view of the fact that there was other evidence, particularly the testimony of Holmes and Youngs, that supported the evidence of a conspiracy. Bishop, however, contends that the testimony from Deputy Layng and the evidence from the search of Bishop's vehicle provided powerful corroboration of Holmes' and Youngs' testimony about Bishop's methamphetamine activities. Bishop also asserts that the testimony from Youngs and Holmes about the June 1998 stop was not

---

5. Bishop lived in Washougal, Washington, a small town on the border between Oregon and Washington, which was immediately adjacent to Clackamas County, Oregon, where the Oregon stop took place. He had traveled to Oregon to see a nearby friend and pick up, according to Youngs, several buckets of red phosphorus to manufacture methamphetamine.

6. The indictment charged that Bishop had conspired with one or more persons over a period of five years prior to the search of his home and his arrest.

7. This case was decided by the Ninth Circuit after judgment was entered in the district court in this case.

8. The government erroneously relies on the rule governing post-conviction review in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which requires the more stringent rule that the defendant must show actual prejudice from error committed to overturn a conviction.

admissible, as it was fruit of the poisonous tree. *See United States v. Ramirez–Sandoval,* 872 F.2d 1392, 1396 (9th Cir.1989). Alternatively, Bishop asserts that their testimony was brief and vague and was not cumulative of the testimony from Deputy Layng and the evidence seized from Bishop's car.

In examining the testimony of Holmes and Youngs, we find that their credibility was seriously challenged at trial and was quite limited as to the evidence seized during that Oregon stop. Holmes testified at trial that in June 1998, Bishop called him from the scene of his Oregon arrest and indicated he might be going to jail. Holmes asked him "is there stuff in the car?" and Bishop's response was "yes." There was no further conversation about what was in the car. Holmes said that Bishop asked him to remove items from his home in Washington and take it to a storage place.[9] Holmes stated that he then went to Bishop's home and removed certain items, such as precursor chemicals, glassware that would compose a methamphetamine lab, receipts, and incriminating paper work. Holmes allegedly removed this material from Bishop's home and took it to the storage unit, the unit he disclosed to Detective Hess when he turned in Bishop.

Youngs testified at trial that he was arrested at the Oregon stop for a probation violation. Youngs explained that he had placed several items in Bishop's car without Bishop's knowledge, and that at the county jail Bishop told him all the items in the car had been confiscated.

The testimony provided by Holmes and Youngs about the Oregon stop provided little, if any, evidence of Bishop's methamphetamine activities. However, the evidence obtained from the Oregon stop provided ample proof that Bishop and Youngs were involved in the manufacture of methamphetamine. The testimony from Officer Layng and the stipulation[10] listing the items seized in Bishop's automobile, provided corroboration of the testimony from Holmes and Youngs, who were receiving deals from the Government in exchange for their cooperation. Of course, the credibility of Holmes' and Youngs' testimony was for the jury to decide. Nonetheless, we find their testimony about the Oregon stop was limited and vague.

In that sense, in the overall review of the record, we cannot say that the jury's consideration of the illegal Oregon stop did not materially affect its verdict on the conspiracy count as well as on the substantive conviction of Bishop for the establishment of a methamphetamine operation. The evidence seized at the illegal Oregon stop provided independent verification of the fact that Bishop had not only conspired with Youngs to manufacture methamphetamine, but that Bishop had established a methamphetamine operation at his home. Under the circumstances, this court cannot say this evidence did not influence the jury on both counts. Accordingly, under the rule of *Chapman v. California* the introduction of this evidence at trial was not harmless beyond a reasonable doubt. In view of this holding, regardless of the admissibility of Holmes' and Youngs' testimony concerning the Oregon stop, even

---

9. Holmes later retracted his statement and stated it was he who called Bishop at the scene of the arrest. One of the arresting officers questioned this testimony since Bishop was immediately placed under arrest and transferred into the patrol car and was not seen using a cell phone. No cell phone was ever found on Bishop or in his car.

10. Bishop's counsel objected to the items seized in his car; when the objection was overruled, he entered into a detailed stipulation of all the items seized.

though such testimony might be considered admissible, it was not sufficient to overcome the prejudicial effect of the evidence seized at the Oregon stop and the stipulation of the items seized.

## IV. CONCLUSION

Therefore, we reverse and remand both counts for a new trial.[11] Although we uphold the district court's decision that the search warrant for Bishop's residence was supported by probable cause, we find the overall admissibility of the illegal seizure made at the illegal Oregon stop was not harmless error beyond a reasonable doubt. Highly persuasive evidence from the Oregon stop was proof of the overall evidence of the conspiracy, as well as of the substantive count on the establishment of a methamphetamine operation. The indictment charging the establishment by Bishop of a methamphetamine operation specifically includes the year of 1998, the same year of the illegal traffic stop. The traffic stop and the items seized in the Oregon illegal stop strongly support the questionable testimony of Holmes and Youngs, who both made deals with the Government.

■ The drug evidence seized at the residence and in the storage unit did not itself prove any conspiracy.[12] A small amount of evidence seized at the storage unit might tend to inculpate Bishop as maintaining an establishment of a methamphetamine operation, but this evidence standing by itself is far from conclusive guilt as to that count.[13] The lynchpin of

guilt upon both counts was the much more incriminating evidence found in Bishop's automobile in June 1998 when the illegal search was made. The testimony of Youngs that the car trip was in furtherance of the conspiracy clearly was inadmissible as fruit of the illegal stop. *See Ramirez–Sandoval*, 872 F.2d at 1396 (holding that "the core inquiry is whether the police would have discovered the evidence if the misconduct had not occurred") (citations omitted). We find that it is impossible to say that the admissibility of this evidence did not taint the prosecution's proof such that the defendant was denied a fair trial. We, therefore, reverse the convictions on both counts and remand for a new trial.

**REVERSED and REMANDED.**

---

11. Because we are remanding for a new trial, we need not address the sentencing issues.

12. Detective Hess admitted at trial that the substance found in the residence did not demonstrate the manufacture of methamphetamine.

13. Detective Hess testified that in the storage unit the officers found a small number of pills

that could be used in conjunction with the other items in the storage unit to manufacture methamphetamine. The other items in the storage unit, without the pills, were not sufficient to manufacture methamphetamine. However, Detective Hess testified that the items in the storage unit and the items from the search of Bishop's home could be combined to provide the necessary ingredients to manufacture methamphetamine.