# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

　　　　　v.

DENNIS EVAN INGHAM,
　　　　　　*Defendant-Appellant.*

No. 05-50698

D.C. No.
CR-04-03237-LAB

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
October 18, 2006—Pasadena, California

Filed February 6, 2007
Amended May 22, 2007

Before: Harry Pregerson, Ronald M. Gould, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Gould

**COUNSEL**

Steven L. Barth, San Diego, California, for defendant-appellant Dennis Evan Ingham.

Sherri Walker Hobson and Stephen Tokarz (argued), Assistant United States Attorneys, San Diego, California, for plaintiff-appellee United States of America.

**ORDER**

The opinion filed on February 7, 2007 and published at 476 F.3d 706 (9th Cir. 2007), is AMENDED as follows.

The first full paragraph on page 712 currently states:

Our cases have consistently upheld a four-point enhancement for those whose role, like Ingham's, was that of organizing or leading a drug distribution conspiracy. For example, in *United States v. Varela*, we affirmed a four-point enhancement where defendant located drug suppliers, negotiated and transacted a series of drug deals, and delivered drugs to undercover officer. 993 F.2d 686, 691 (9th Cir. 1993). Similarly, in *United States v. Roberts*, we held that it was not clear error to impose a four-point enhancement where defendant negotiated sale of chemicals for production of methamphetamine with an undercover agent and gave an order to coconspirator to make delivery. 5 F.3d 365, 371 (9th Cir. 1993). And again in *United States v. Ponce*, we upheld a four-point enhancement where defendant oversaw procurement and distribution of large quantities of cocaine. 51 F.3d 820, 827 (9th Cir. 1995). *See also Salcido-Corrales*, 249 F.3d at 1154-55 (upholding two-point organizer/leader enhancement in conspiracy involving fewer than five participants where defendant "coordinated the distribution of drugs that he received from out-of-state sources[,] . . . initiated drug deals with the undercover officer[,] negotiated the terms of the deals and set their locations and times").

In the current second sentence, after "For example," the remainder of the sentence—"in *United States v. Varela*, we affirmed a four-point enhancement where defendant located drug suppliers, negotiated and transacted a series of drug deals, and delivered drugs to undercover officer. 993 F.2d 686, 691 (9th Cir. 1993)."—is deleted. "Similarly," from the current third sentence is also deleted and now replaces "And again" in the current fourth sentence. The paragraph as amended shall now read as follows:

> Our cases have consistently upheld a four-point enhancement for those whose role, like Ingham's, was that of organizing or leading a drug distribution conspiracy. For example, in *United States v. Roberts*, we held that it was not clear error to impose a four-point enhancement where defendant negotiated sale of chemicals for production of methamphetamine with an undercover agent and gave an order to coconspirator to make delivery. 5 F.3d 365, 371 (9th Cir. 1993). Similarly, in *United States v. Ponce*, we upheld a four-point enhancement where defendant oversaw procurement and distribution of large quantities of cocaine. 51 F.3d 820, 827 (9th Cir. 1995). *See also Salcido-Corrales*, 249 F.3d at 1154-55 (upholding two-point organizer/leader enhancement in conspiracy involving fewer than five participants where defendant "coordinated the distribution of drugs that he received from out-of-state sources[,] . . . initiated drug deals with the undercover officer[,] negotiated the terms of the deals and set their locations and times").

No further petitions for rehearing or rehearing en banc will be accepted.

**IT IS SO ORDERED.**

## OPINION

GOULD, Circuit Judge:

Dennis Evans Ingham entered a plea of guilty on one count of conspiracy to distribute marijuana under 21 U.S.C. §§ 841 and 848. In light of a four-point increase in the offense level for Ingham's aggravating role as organizer/leader under section 3B1.1(a) of the United States Sentencing Guidelines ("the Guidelines"), the district court imposed a 100-month sentence, which was three months more than the top of the calculated guideline range due to Ingham's extensive criminal history. Ingham argues that the district court did not reconcile his objection under Federal Rule of Criminal Procedure 32(i)(3) that only a two-point increase in the offense level was proper because the district court did not explicitly address the question of whether Ingham exercised control over his fellow co-conspirators. Ingham also argues that the Presentence Report ("PSR") that recommended the four-point enhancement in the offense level included unreliable hearsay. Ingham argues additionally that, under *United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004); and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the facts underpinning the organizer/leader role must be admitted by the defendant or proved by a jury beyond a reasonable doubt. Finally, Ingham contends that the district court's application of the advisory Guidelines under *Booker* was contrary to the Ex Post Facto and Due Process Clauses of the United States Constitution. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## I

On December 21, 2004, an indictment was filed against Ingham, alleging two felony counts for conspiracy to import and distribute marijuana in excess of 100 kilograms. On April 28, 2005, Ingham waived the indictment and was charged on a superseding information with a single count of conspiracy

to distribute forty-six kilograms or more of marijuana in violation of 21 U.S.C. §§ 841 and 848. That same day, Ingham entered into a plea agreement acknowledging that he was subject to a maximum statutory sentence of 120 months, a $500,000 fine, and at least four years of supervised release. Under the plea agreement, Ingham also admitted the factual basis of a narcotics smuggling conspiracy that began in February 2004 and ended on June 23, 2004, and that "he acted as a leader and manager of this importation conspiracy."

On June 27, 2005, a PSR was filed that made the following undisputed factual findings regarding the conspiracy: In August 2003, a special agent with United States Immigration and Customs Enforcement ("ICE") learned that Ingham may have been leading an organization involved in smuggling large quantities of narcotics into the United States by boat. As of February 24, 2004, federal customs agents intercepted phone conversations indicating Ingham's desire to coordinate a maritime smuggling operation covering Mexico, Panama and Iraq. On March 9, 2004, a cooperating source ("CS") approached Ingham in Canada to discuss a more immediate plan to smuggle drugs from Canada into the United States, the proceeds of which Ingham contemplated using to finance the larger maritime venture involving Mexico, Panama and Iraq. In initiating the more immediate plan, Ingham contacted a pilot, who was an undercover officer, with an offer to pay up to $50,000 to fly loads of marijuana into the United States where Ingham would arrange for transport to California. On June 1, 2004, Ingham gave the CS $65,000 to start a front corporation to further the maritime smuggling venture. Ingham also directed the CS and Ingham's former wife, Kay Samuelson, to exchange a total of $13,000 for small denominations to be used in aid of the smuggling operation. On June 20, 2004, federal agents observed Samuelson visit three separate banks where she exchanged $3,000 for $100 bills.

Also on June 20, 2004, Ingham, Ritch and the undercover officer discussed routes and time schedules for transporting

the narcotics within Orange County, California. On June 23, 2004, three other co-conspirators and the CS gathered at an airstrip in Kalso, British Columbia, a location selected by Ingham, where the co-conspirators would meet the pilot/undercover officer who in turn would undertake the first trip to the United States. Before the plane's arrival, however, the Royal Canadian Mounted Police, who were conducting surveillance of the airstrip in concert with U.S. border patrol agents, interdicted the operation and arrested the co-conspirators, seizing a total of 99.45 kilograms of marijuana and nearly 19,000 ecstasy pills.

A fourth co-conspirator, Daniel Hall, was also arrested on June 23, 2004 in Seattle, Washington while under surveillance by ICE agents. According to Hall, Ingham had previously provided him with a cell phone, $900 and airplane tickets from California to Seattle. At the Seattle airport, Hall met an unknown man with a vehicle that, without Hall's knowledge, had been equipped with a tracking device. Hall drove the vehicle to meet three other individuals who led him to a Seattle neighborhood to pick up several bags. When ICE agents triggered the kill switch on the vehicle, Hall was arrested with a total of forty-six kilograms of marijuana. In a post-arrest statement, Hall stated that Ingham had provided him with funds and instructions to drive the narcotics shipment to California. Later that day, after the transaction with Hall, the three individuals traveled to the Canadian border where their car was searched and $160,000 was discovered behind the glove box.

On January 28, 2005, Ingham was arrested in Laguna Beach, California on charges arising out of the marijuana smuggling conspiracy.

The district court conducted two sentencing hearings on August 1 and 8, 2005. At the August 8 hearing, the district court addressed the main issue of whether Ingham should receive a two-point (supervisor) enhancement under U.S.S.G.

§ 3B1.1(c) or a four-point (organizer/leader) enhancement under U.S.S.G. § 3B1.1(a) for his role in the conspiracy.[1] In the plea agreement, the parties stipulated to the following baseline calculations: a base offense level of 26 due to 145 kilograms of marijuana that reflected Ingham's relevant conduct, a two-point enhancement for an aggravating role, and a three-point deduction for acceptance of responsibility. These calculations would have resulted in a maximum guideline sentence of seventy-eight months. The PSR, however, recommended a four-point aggravating role enhancement, describing Ingham's role as follows:

> [Because of Ingham's plan to fund a larger maritime venture], authorities learned of Ingham's more immediate plan to import marijuana from British Columbia into the United States. But in order to do that, he needed help, which came in the form of codefendants Ritch, Walsh, Mehan, Hall, the UC pilot, and the CS, all of whom worked at the direction of Ingham. Other parties, like Kay Samuelson, were tangentially connected to the offense, but not

---

[1]The district court also addressed the PSR's recommendation that a criminal history category IV was appropriate because Ingham was a career offender. Ingham had five prior convictions: (1) a 1972 conviction in the Southern District of Florida for importing 4,000 pounds of marijuana, for which Ingham served five years; (2) a 1985 conviction in the Northern District of California for conspiracy to import marijuana with nineteen others, for which Ingham served seventy-eight months; (3)-(4) two convictions in 1988 in the District of Hawaii and the Western District of Washington for criminal enterprise and conspiracy to distribute more than 1,000 pounds of marijuana; and (5) a 1988 conviction in the Central District of California for failure to appear. At the August 1 hearing, the district court postponed sentencing until August 8, 2005 because the government could not provide adequate documentation of Ingham's earlier convictions to support the recommended enhancement based on Ingham's purported career offender status. At the August 8 hearing, the district court found that the documentation of the 1988 convictions did not show that they were separate offenses under *Shepard v. United States*, 544 U.S. 13 (2005), which barred a career offender enhancement.

charged in the underlying indictment. This conspiracy stretched from San Diego, California, to Kalso, British Columbia, and included a drug seizure in Seattle, Washington. These events were Ingham's brainchild, and . . . he oversaw just about everything that transpired. USSG § 3B1.1(a) provides for a four-level increase if the defendant was an organizer leader of a criminal activity that involved five or more participants. . . . This adjustment accurately reflects Ingham's role in the instant conspiracy.

In his objections to the PSR, Ingham claimed that he could not be an organizer/leader because he did not "exercise control over others." The probation officer amended the PSR to address Ingham's objection to the enhancement:

Ingham did not report to anyone; everyone reported to him and acted at his direction because he conceived the marijuana importation conspiracy. Because it was a far-reaching operation . . . from San Diego to British Columbia, Ingham needed to bring others in to help him, including the three codefendants, a pilot, the CS, and Kay Samuelson. There is no indication Ingham was managing the conspiracy for anyone else. Every organization requires a leader, and in this case, Ingham was the leader.

The district court agreed with the PSR's "factually based" analysis, with explicit reference to the events that precipitated the June 23, 2004 operations as detailed in the PSR. Judge Burns prefaced his ruling with a recognition that the guideline calculation was advisory and made the following observations about his rationale: "Ingham did have a supervisory role over a plot involving five or more participants. . . . The Probation Officer finds—and I agree this is an astute observation—all of the events were Mr. Ingham's brainchild. . . . To one extent or another, he oversaw everything. . . . He was extensively involved [in the criminal activity]."

Based on the four-point enhancement, a three-point decrease for acceptance of responsibility, and a base offense level of 26, the district court found that the applicable advisory guideline range was 78 to 97 months and imposed a 100-month sentence and four years supervised release. Although both parties recommended a 78-month prison term, the district court sentenced Ingham to three months above the top of the guideline range due to Ingham's extensive criminal history. Stressing that Ingham was a "kingpin," the district court overruled Ingham's renewed objection that the plea agreement called for a two-point aggravating role increase. This timely appeal followed.

## II

**[1]** Ingham first argues that the district court did not comply with Federal Rule of Criminal Procedure 32(i)(3) ("Rule 32") when it failed to resolve the controverted fact of whether Ingham exercised control over the other co-conspirators in imposing a four-point aggravating role enhancement.[2] Rule 32(i)(3) provides in pertinent part:

> At sentencing, the court (A) may accept any undisputed portion of the presentence report as a finding of fact; [and] (B) must — for any disputed portion of the presentence report or other controverted matter — rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing.

---

[2]We review "the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of this case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005). If the sentence resulted from an incorrect application of the Guidelines, and the error is not harmless, we remand to the district court for further proceedings. *See United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006).

Fed. R. Crim. P. 32(i)(3)(A)(B). "It is well settled in this circuit that when the district court fails to make the required Rule 32 findings or determinations at the time of sentencing, we must vacate the sentence and remand for resentencing." *United States v. Carter*, 219 F.3d 863, 866 (9th Cir. 2000). A district court "may not adopt conclusory statements unsupported by facts or the guidelines." *United States v. Williams*, 41 F.3d 496, 499 (9th Cir. 1994) (internal citations and quotation marks omitted). Rule 32 findings "must be 'express' or 'explicit,' " *United States v. Houston*, 217 F.3d 1204, 1208 (9th Cir. 2000), but need not be detailed and lengthy. *United States v. Karterman*, 60 F.3d 576, 583 (9th Cir. 1995). Rather, "they need only state the court's resolution of the disputed issues." *Id*.

Section 3B1.1 of the Guidelines informs the district court's determination of an increase in offense level based on the defendant's aggravating role in the offense:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1(a)-(c). The district court should be further guided by the following factors relevant to the defendant's conduct:

> [the] exercise of decision making authority, the nature of participation in the commission of the

offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S. Sentencing Guidelines Manual § 3B1.1, cmt. n.4 (2005) [hereinafter "U.S.S.G. Manual"].

**[2]** In *United States v. Avila*, the case on which Ingham stakes his argument, we held that "to sustain a finding that a defendant was an organizer or a leader [under § 3B1.1(a)], there must be evidence that the defendant exercised some control over others involved in the commission of the offense *or* was responsible for organizing others for the purpose of carrying out the crime." 95 F.3d 887, 889 (9th Cir. 1996) (emphasis added). Ingham cites *Avila* for the incorrect proposition that a defendant must exercise control *and* organizational authority to merit the four-point leader/organizer enhancement. In other words, Ingham claims that the rule in *Avila* is conjunctive.[3] In construing the interpretation of § 3B1.1(a) under *Avila* to require a showing on both elements of control over others *and* organizational authority, Ingham misreads the plain language in *Avila*, which consistently states the rule in the disjunctive. *See, e.g., Avila*, 95 F.3d at 890 ("The cases in which this court has upheld a four-level upward adjustment . . . involved defendants who . . . exercised some degree of control *or* organizational authority over others.") (emphasis added). *See also United States v. Salcido-Corrales*, 249 F.3d 1151, 1154 (9th Cir. 2001) (stating rule in the disjunctive) (citing *United States v. Harper*, 33 F.3d 1143, 1151 (9th Cir. 1994)).

---

[3]To complete his argument, Ingham asserts that the district court erred because there was no showing that he exercised "control" over the plan where each co-conspirator was "an equal partner in the scheme, . . . and the plans were agreed to by all."

**[3]** The facts of Ingham's role in organizing the drug smuggling conspiracy can be distinguished from the defendant in *Avila* who merely functioned as a "go-between" by negotiating for a fee the sale of a kilogram of cocaine between the seller and an undercover officer posing as a buyer, and then later delivering the cocaine to the buyer, along with two co-conspirators. 95 F.3d at 888, 890. By contrast, Ingham's role reflected organizational authority over the conspiracy where he devised and oversaw the entire importation scheme: Ingham negotiated with the pilot to fly the marijuana to the United States, and with Ritch to be the source for the marijuana; coordinated travel routes in the United States; selected the airstrip at Kalso, British Columbia; directed the CS and Samuelson to exchange a total of $13,000 for small denominations to facilitate smuggling; supplied expense money in anticipation of the airborne dimension of the June 23, 2004 operation; and gave funds and instructions to Hall to transport the forty-six kilograms of marijuana from Seattle to California. The amended PSR reinforces the finding that Ingham was the organizer/leader by emphasizing that the co-conspirators reported to Ingham whereas Ingham reported to no higher authority. Unlike the defendant in *Avila*, Ingham's role far exceeded that of a go-between.

**[4]** Our cases have consistently upheld a four-point enhancement for those whose role, like Ingham's, was that of organizing or leading a drug distribution conspiracy. For example, in *United States v. Roberts*, we held that it was not clear error to impose a four-point enhancement where defendant negotiated sale of chemicals for production of methamphetamine with an undercover agent and gave an order to coconspirator to make delivery. 5 F.3d 365, 371 (9th Cir. 1993). Similarly, in *United States v. Ponce*, we upheld a four-point enhancement where defendant oversaw procurement and distribution of large quantities of cocaine. 51 F.3d 820, 827 (9th Cir. 1995). *See also Salcido-Corrales*, 249 F.3d at 1154-55 (upholding two-point organizer/leader enhancement in conspiracy involving fewer than five participants where

defendant "coordinated the distribution of drugs that he received from out-of-state sources[,] . . . initiated drug deals with the undercover officer[,] negotiated the terms of the deals and set their locations and times").

[5] The district court complied with Rule 32(c)(1) without explicitly addressing Ingham's contention that he did not exercise control over the co-conspirators. The district court found expressly that the conspiracy was Ingham's "brain-child"; that it was extensive and involved five or more participants whom Ingham recruited; and that Ingham provided funds and operational direction for the June 23, 2004 plans. The record leaves no room for doubt that Ingham had organizational authority warranting a four-point increase under U.S.S.G. § 3B1.1(a). The district court rested these conclusions on the undisputed factual basis of the conspiracy recited in the PSR. The district court's findings were based on evidence sufficient to satisfy five of the seven criteria for a § 3B1.1(a) enhancement: (1) he "exercise[d] . . . decision making authority," (2) his conduct involved extensive "participation in the commission of the offense," (3) he engaged in "the recruitment of accomplices," (4) he thoroughly participated "in planning [and] organizing the offense," and (5) "the nature and scope of the illegal activity" was far-reaching. *See* U.S.S.G. Manual § 3B1.1, cmt. n.4.

[6] Under the disjunctive rule stated in *Avila*, a finding that Ingham "exercised control over others" is superfluous where, as here, the sentencing court properly concludes that the defendant organized or led a conspiracy of the scope depicted under U.S.S.G. § 3B1.1(a). Thus the district court correctly resolved Ingham's objections under Rule 32(c)(1) in light of the material disputed issues. Once it was determined that Ingham organized and led the conspiracy of five or more participants to import drugs from Canada, that was sufficient to sustain a four-point increase of offense level irrespective of whether Ingham controlled the day-to-day operations of those he had recruited to implement his scheme.

## III

**[7]** In reliance on *Crawford v. Washington*, 541 U.S. 36 (2004), Ingham contends that the use of hearsay statements by the CS in preparing the PSR violates the Confrontation Clause of the Sixth Amendment because Ingham did not have an opportunity to cross examine the CS at the sentencing hearing.[4] Ingham's argument under *Crawford* is foreclosed by our authority in *United States v. Littlesun*, 444 F.3d 1196 (9th Cir. 2006). In *Littlesun*, we held that "the law on hearsay at sentencing is still what it was before *Crawford*: hearsay is admissible at sentencing, so long as it is accompanied by some minimal indicia of reliability." 444 F.3d at 1200 (internal citation and quotation marks omitted); *see also Williams v. New York*, 337 U.S. 241, 246-47 (1949).

Ingham alternatively argues that the district court erroneously failed to consider the basis of the PSR, which consisted of hearsay statements by the CS that allegedly lacked sufficient indicia of reliability because the CS was biased and/or motivated to lie. In lodging his due process challenge, Ingham relies on *United States v. Corral*, 172 F.3d 714 (9th Cir. 1999), and *United States v. Huckins*, 53 F.3d 276 (9th Cir. 1995).

We reject Ingham's arguments relying on these precedents. In *Corral*, the sentencing judge denied a minor role adjustment, as recommended in the PSR, without stating whether his denial was affected by the accomplice hearsay incorporated into the PSR that defendant was the "right hand man" to the main conspirator. 172 F.3d at 715. We concluded in that case that the district court "relied on unreliable hearsay"

---

[4]"Alleged violations of the Confrontation Clause are reviewed de novo." *United States v. Boone*, 229 F.3d 1231, 1233 (9th Cir. 2000). "A district court judge's determination that a particular item of evidence is sufficiently reliable is reviewed for abuse of discretion." *United States v. Marin-Cuevas*, 147 F.3d 889, 895 (9th Cir. 1998).

because the government admitted the unreliability of the statements and the facts indicated that defendant was not substantially involved in the conspiracy. *Id.* at 716. In *Huckins*, the defendant received a sentence enhancement as recommended by the PSR where an accomplice stated that the defendant carried a gun during a robbery, an account that was uncorroborated by a witness bank teller. 53 F.3d at 278. We held in that case that this statement was unreliable hearsay because it was unsupported by extrinsic evidence and "made in the context of plea negotiations . . . [possibly] to curry favor with law enforcement officials by implicating his accomplice." *Id.* at 279.

Denying that he was the conspiracy's leader, Ingham disputed two factual assertions in the PSR that were conceivably connected to hearsay statements by the CS:[5] He objected to (1) "the insinuation . . . that he was instigating an attempt to smuggle marijuana into the United States from Mexico (by way of Iraq) on oceangoing vessels . . ." ; and (2) that "it was the CI that approached [him] after not having worked together for twenty years [, and that Ingham] had no plans to smuggle marijuana . . . prior to being approached by the CI."

As to the first objection, any allegedly unreliable hearsay is irrelevant because the district court stated that the maritime plan involving Mexico and Iraq was only "background information" that would not affect the sentence.[6] Stated another way, whatever were Ingham's aims concerning a plan involving Mexico and Iraq, these did not affect his role as "organizer" of the conspiracy to import drugs from Canada within the

---

[5]While the government characterizes the individual who assisted in the investigation as a "confidential source," Ingham describes the same person as a "confidential informant" ("CI").

[6]In doing so, the district court satisfied Rule 32(i)(3)(B). "[In regard to disputed facts, the district court must] determine that a ruling is unnecessary . . . because the matter will not affect sentencing or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B).

meaning of § 3B1.1(a). As for the second objection, whether Ingham first sought out the CS, or whether the CS first approached Ingham, is also irrelevant to the assessment of Ingham's role in the drug importation conspiracy and does not bear on the reliability of the PSR's remaining factual predicate for the conspiracy.

[8] As discussed above, there is ample evidence in the uncontroverted facts that Ingham pursued the plans to smuggle drugs from Canada, whatever his motivations; enlisted the co-conspirators and directed their roles; selected air and land transportation routes from British Columbia to distribution points in the United States; and provided funding and operational support for the scheme. Even if the CS had first suggested the idea, as Ingham alleges, Ingham was nevertheless the leader with "organizational authority" from the conspiracy's inception. *See Avila*, 95 F.3d at 890. The organizer/leader role determination under § 3B1.1(a) does not hinge on the issue of which co conspirator first conceives of the idea to commit the offense. *Cf.* U.S.S.G. Manual § 3B1.1, cmt. n.4 (stating that the four-point "adjustment does not apply to a defendant who *merely* suggests committing the offense") (emphasis added). Whether or not the CS first approached Ingham is immaterial to the factual findings in support of the four-point enhancement.[7] Accordingly, the district court did

---

[7]By contrast, in *United States v. Ortiz*, 993 F.2d 204 (9th Cir. 1993), we reversed the district court when it relied on unreliable hearsay from a confidential informant to establish a material point for sentencing purposes, i.e. that the defendant sold 163 kilograms of marijuana over an 18-month period. *Id.* at 206-07. There the government could corroborate the informant's hearsay with only one intercepted telephone conversation indicating that the defendant had purchased approximately one kilogram of marijuana in a single transaction. We held in that case that the district court clearly erred in relying on the informant's unreliable hearsay. *Id.* at 208. In sharp contrast to *Ortiz*, where the challenged hearsay was improperly used to support the findings on the pivotal issue of the quantity of marijuana sold, here the allegedly unreliable hearsay statements concern only the peripheral and immaterial issue of whether the CS first prompted the smuggling scheme that Ingham ultimately organized.

not abuse its discretion in relying on the PSR despite possible inclusion of hearsay statements by the CS.

## IV

Ingham argues under *Booker*, 543 U.S. 220; *Blakely*, 542 U.S. 296; and *Apprendi*, 530 U.S. 466, that facts supporting the aggravating organizer/leader role should have been submitted to a jury and found beyond a reasonable doubt.

**[9]** Ingham's argument is foreclosed by our precedents: "In the aftermath of *Booker*, we have noted that . . . the preponderance of the evidence standard will still generally satisfy due process concerns . . . . [B]ut, where an extremely disproportionate sentence results from the application of an enhancement, the government may have to satisfy a clear and convincing standard." *United States v. Staten*, 450 F.3d 384, 392-93 (9th Cir. 2006) (internal quotation marks omitted) (citing *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005) (stating same rule in context of mandatory minimums)); *see also United States v. Lyons*, 453 F.3d 1222, 1236 (9th Cir. 2006) (rejecting theory that facts in support of sentence enhancement are subject to reasonable doubt standard).

**[10]** The district court did not announce the standard of proof under which it determined the facts in support of the § 3B1.1(a) enhancement, and Ingham does not argue here that his is the exceptional case that requires the clear and convincing evidence standard. We need not decide here whether an "extremely disproportionate sentence" resulted from the application of § 3B1.1(a) that added twenty-two months over the 78-month maximum advisory guideline sentence calculated according to U.S.S.G. § 3B1.1(c). We conclude that there was no clear error in any event because the conceded fact that Ingham organized the conspiracy is sufficient to find the sentence-enhancing facts under either standard of proof.

# V

Ingham asserts that the district court's use of the Guidelines as advisory was an unconstitutional retroactive application of *Booker* under the Fifth Amendment's Ex Post Facto and Due Process Clauses.

**[11]** Again, Ingham's argument runs into a stone wall of our prior precedent, in which we have stated the following rule: "The Ex Post Facto Clause . . . by its terms, applies only to changes in the law resulting from legislative or executive action, but the Court has extended similar principles to the Due Process Clause to cover 'unforeseeable [judicial] construction of a criminal statute.' " *United States v. Dupas*, 419 F.3d 916, 921 n.3 (2005) (quoting *Bouie v. City of Columbia*, 378 U.S. 354-55 (1964)).[8] "[I]n *Booker*, the Supreme Court expressly stated that both holdings should be applied to cases on direct review." *Dupas*, 419 F.3d at 920 (internal citations and quotation marks omitted); *see also United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc) (holding opportunity to cure Sixth Amendment defect under *Booker* by remand for re-sentencing under advisory Guidelines necessarily implies permissible retroactive application of *Booker*

---

[8]In *Dupas*, we considered a defendant's argument under the Fifth Amendment's Due Process Clause that *Booker* should not apply retroactively. *Dupas*, 419 F.3d at 918. In resolving the case against the *Dupas* defendant, we also concluded that a retroactive application of the *Booker* remedial opinion comported with ex post facto principles. *See id.* at 919-21. Ingham attempts to sidestep the effect of *Dupas* by arguing that its discussion of ex post facto principles was dicta and thus not controlling. We believe that the careful three-page treatment of the subject in *Dupas* was not a dictum, *i.e.* it was not "made casually and without analysis, . . . uttered in passing without due consideration of the alternatives, or . . . [done as] a prelude to another legal issue that commands the panel's full attention." *See United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) (Kozinski, J.); *see also Staten*, 450 F.3d at 392-93 (adopting *Dupas* analysis to reject identical due process argument reviewed as "traditional ex post facto argument"). Whether or not *Dupas* is dictum on this point, we follow the persuasive reasoning of *Dupas* in rejecting Ingham's claim.

remedial opinion). *Dupas* also re-affirmed that the ex post facto bar under *Bouie* "applied only to after-the-fact increases in the scope of criminal liability and not to retroactive sentence enhancements." 419 F.3d at 921 (citing *United States v. Newman*, 203 F.3d 700, 703 (9th Cir. 2000)); s*ee also Webster v. Woodford*, 369 F.3d 1062, 1069 (9th Cir. 2004) (noting that "*Bouie* does not apply to sentencing schemes").

**[12]** When *Booker* rendered the Guidelines advisory, Ingham had yet to be sentenced, *i.e.* his case had not proceeded through direct review. Thus *Booker*, under its express terms, applies.[9]

**AFFIRMED.**

---

[9]We also reject Ingham's due process challenge, which is similarly foreclosed by *Dupas*. *Dupas* underscored that fair warning was "the touchstone of retroactivity analysis under the Due Process Clause." 419 F.3d at 921 (relying on *Rogers v. Tennessee*, 532 U.S. 451, 458 (2001) ("[*Bouie*'s] rationale rested on core due process concepts of notice, foreseeability, and . . . the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct.")). Ingham did not suffer a due process violation here, despite a postconviction application of *Booker*, because when he committed the crime, entered his plea agreement and was sentenced, the statutory maximum sentence was 120 months under 21 U.S.C. § 841(b)(1)(D). Ingham thus at all times had notice and fair warning.