**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

TRAVIS JOB,
*Defendant-Appellant*.

No. 14-50472

D.C. No.
3:13-cr-1128-BEN-11

ORDER AND
AMENDED OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted December 9, 2016
Pasadena, California

Filed March 14, 2017
Amended August 21, 2017

Before: A. Wallace Tashima and Richard A. Paez, Circuit
Judges, and Paul L. Friedman,* District Judge.

Order;
Opinion by Judge Friedman

---

*The Honorable Paul L. Friedman, United States District Judge for
the District of Columbia, sitting by designation.

## SUMMARY**

### Criminal Law

In a case in which the defendant was convicted of conspiracy to distribute methamphetamine and possession of methamphetamine with intent to distribute, the panel filed (1) an order (a) amending its March 14, 2017, opinion affirming in part and vacating in part the district court's judgment and remanding for further proceedings; (b) denying petitions for panel rehearing; and (c) denying on behalf of the court a petition for rehearing en banc; and (2) an amended opinion.

In the amended opinion, the panel held that the district court erred in denying the defendant's motions to suppress evidence found during searches of his person, car, and home solely on the basis that the defendant, a probationer, was subject to a Fourth Amendment search waiver at the time of the searches.

The panel held that the district court erred by applying the holding in *United States v. King*, 736 F.3d 805 (9th Cir. 2013) – that a suspicionless search, conducted pursuant to a suspicionless-search condition of a violent felon's probation agreement, does not violate the Fourth Amendment – to this case. The panel explained that a Fourth Amendment search waiver cannot provide a justification for a search of a probationer where the officers were unaware of the waiver before they undertook the search, and noted that the district

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

court failed to recognize that the *King* decision was limited to individuals on probation for violent felonies.

The panel rejected the government's arguments that the search of the defendant's person was justified as a valid *Terry* stop and frisk, or as a valid protective sweep. The panel rejected the government's arguments that the search of the defendant's car was justified by the automobile exception to the warrant requirement, or by the officers' discovery of the Fourth Amendment search waiver where the government did not prove by a preponderance of the evidence that the officers knew about the search waiver before searching the car. The panel held that the search of the defendant's home was conducted pursuant to a valid search warrant.

The panel concluded that the district court's failure to suppress the unlawfully seized evidence was harmless as to the conspiracy conviction, but could not conclude beyond a reasonable doubt that the evidence did not contribute to the jury's verdict on the possession-with-intent-to-distribute count.

The panel held that the district court did not err in refusing to give a multiple conspiracies instruction.

**COUNSEL**

Todd W. Burns (argued), Burns and Cohan, San Diego, California, for Defendant-Appellant.

Mark R. Rehe (argued), Assistant United States Attorney; Peter Ko and Helen H. Hong,, Chief, Appellate Section, Criminal Division; Alana W. Robinson, Acting United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**ORDER**

The opinion filed on March 14, 2017 is amended as follows:

On page 896, paragraphs 2–3 remove <for two reasons. First, it> and replace with <It>.

On page 896, paragraph 3 after <undertook the search.> add <The district court erred in denying Job's motions to suppress evidence from all three searches solely on the basis of Job's Fourth Amendment search waiver.>

On page 896–97 delete the fourth and first paragraphs and replace with <In addition, we note that the district court failed to recognize that our decision in *King* was limited to individuals on probation for violent felonies. 736 F.3d at 810; *see also Lara*, 815 F.3d at 609–10 (noting that *King* was "expressly limited" to violent felons and does not apply to individuals on probation for nonviolent drug crimes). Although the parties dispute whether Job was on probation for a felony or a misdemeanor, he was on probation for a

nonviolent drug offense.[2]  This fact may or may not have changed the district court's decision to deny Job's motion to suppress if it had undertaken the careful balancing test to determine whether the search at issue was reasonable under the Fourth Amendment, as alluded to in *King* and discussed in detail in *Lara*.  *See Lara*, 815 F.3d at 609–12; *King*, 736 F.3d at 808–10.  But the district court did not have the benefit of guidance from our decision in *Lara* at the time of its decision.  The district court's decision to rely exclusively on *King*, however, was error.>

On page 897, footnote 2, after <*People v. Morales*, 169 Cal. Rptr. 3d 814, 820 (Ct. App. 2014)> add <In *Lara*, we said that violations of California Health and Safety Code §§ 11378 and 11379(a), for the possession for sale and transportation of methamphetamine, are "nonviolent drug crime[s]."  815 F.3d at 610.  Job was on probation for a similar offense, unlawful possession of methamphetamine, in violation of § 11377(a). >

An Amended Opinion is filed concurrently with this order.

---

[2] At the time of the searches, Job was on probation for unlawful possession of a controlled substance, in violation of California Health and Safety Code § 11377(a).  This offense is known as a "wobbler" because it can be punished as a misdemeanor or a felony.  *United States v. Diaz-Argueta*, 564 F.3d 1047, 1049 (9th Cir. 2009); *see also People v. Morales*, 169 Cal. Rptr. 3d 814, 820 (Ct. App. 2014).

In *Lara*, we said that violations of California Health and Safety Code §§ 11378 and 11379(a), for the possession for sale and transportation of methamphetamine, are "nonviolent drug crime[s]."  815 F.3d at 610.  Job was on probation for a similar offense, unlawful possession of methamphetamine, in violation of § 11377(a).

With these amendments, the petitions for panel rehearing by Appellee and Appellant are **DENIED**.

The full court has been advised of Appellee's petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petition for rehearing en banc is **DENIED**.

No further petitions for rehearing or petitions for rehearing en banc may be filed.

---

**OPINION**

FRIEDMAN, District Judge:

Travis Job appeals from his conviction after a jury trial on two drug-related offenses: (1) conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and (2) possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and his sentence of 365 months, followed by a lifetime of supervised release. He argues that the district court erred by denying his motions to suppress evidence found during searches of his person, car, and home. He also argues that the district court erred when it denied his requests for jury instructions on the lesser included offense of simple possession and on multiple conspiracies. He contends that the district court erred when calculating his guidelines sentencing range when it applied: (1) a two-level increase for an offense involving the importation of methamphetamine under United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(b)(5), (2) a two-level increase for an offense in which the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance under § 2D1.1(b)(12),

and (3) a two-level increase for an offense involving an unlawful discharge of a toxic substance under § 2D1.1(b)(13)(A). Finally, he argues that his sentence of 365 months is substantively unreasonable.

We have jurisdiction under 28 U.S.C. § 1291; we affirm Job's conviction in part, vacate it in part, and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises from an investigation into a conspiracy involving the importation of methamphetamine from Mexico and its distribution in San Diego County and South Carolina. The conspiracy was led by Job's codefendant at trial, Robert Rodriguez. The government alleged that Job served two roles within the conspiracy. Rodriguez fronted methamphetamine to Job for sale to third parties, meaning that drugs were provided to Job on the promise that he would pay Rodriguez later, after the drugs were sold. In addition, Job "cut" methamphetamine for Rodriguez and Carrie Brown-Rodriguez, Rodriguez's wife. Cutting refers to adding another product to pure methamphetamine to add more weight to it and increase the quantity available for resale.

On October 3, 2012, the police arrested Job for possession of a controlled substance for sale and possession of drug paraphernalia after stopping him and searching his person and his car.[1] That afternoon, Officer Nicholas Dedonato and other officers arrived at 2504 Snowdrop Street

---

[1] The facts surrounding the searches on October 3 are drawn from the police report and Officer Nicholas Dedonato's trial testimony. The district court did not conduct an evidentiary hearing on the motions to suppress.

looking for another man, Richard Elliot, who is unrelated to this case. Upon the officers' arrival at the home, they saw two men open the garage door. These men were identified as Travis Job and William Holt, who also is unrelated to this case. According to Officer Dedonato, both men looked "very surprised to see the police." Job "appeared very nervous and was wearing a baggy shirt, which concealed his waistband and baggy cargo shorts, with the pockets appearing to be full of items."

In the police report, Officer Dedonato stated that he "felt it would be much safer for my partners and myself if I patted Job down for weapons." He handcuffed Job prior to the pat down. During the pat down, he "felt a hard tube like object with a bulbous end in [Job's] left cargo pocket." Based on his training and experience, Officer Dedonato recognized the object as an illegal glass pipe. Officer Dedonato removed the pipe, which "contained a burnt white residue." In Job's pockets, Officer Dedonato found $1450 in cash and Job's car keys. He then placed Job under arrest for possession of narcotics paraphernalia.

After seizing Job's car keys, Officer Dedonato asked Job where he had parked his car. Job "looked around nervously and said, 'I don't know.'" Officer Dedonato pressed the unlock button on Job's key fob, and the car in the driveway beeped as it unlocked. Two other officers then searched Job's car. They found a cigarette pack containing 3.9 grams of methamphetamine in "two Ziploc style bags" and a hand-rolled cigarette with "Spice," which they recognized as an illegal street drug; another glass pipe containing burnt white residue; and a Blackberry cell phone.

At some point during the encounter, the officers conducted a records check, "which revealed [Job] was currently on probation with a 4th amendment waiver."

While on probation for a state drug offense, Job was required to "submit person, property, place of residence, vehicle, [and] personal effects to search at any time with or without a warrant, and with or without reasonable cause, when required by a probation officer or other law enforcement officer." It is unclear when, if ever, the officers learned the precise scope of Job's search waiver.

In December of 2012, police officers obtained a search warrant for Job's residence, based in part on intercepts from wiretaps of Rodriguez's phone. While executing the search warrant, the officers found various items including: 56.4 grams of methamphetamine in Job's freezer, five scales, small stashes of methamphetamine totaling 15.28 grams, baggies, several glass pipes, and undisclosed amounts of Spice, bath salts, and marijuana. In the garage, the officers found an invoice for items including a test tube, a hand boiler, and an Erlenmeyer flask. In the kitchen, the officers found cleaning supplies, a microwave, a hot plate, and a white apron. After the search, the San Diego County Department of Environmental Health inspected Job's apartment and found that the downstairs portion was "contaminated with methamphetamine residuals." In a subsequent report, the department concluded that methamphetamine had been stored in Job's kitchen and living room, but that it was "unknown if manufacturing was taking place" in the apartment.

Before trial, Job filed two motions to suppress: one for the evidence found on his person and in his car in October and one for the evidence found during the search of his home in December. With its response opposing both motions, the government submitted a police report describing the events of October 3, 2012. The district court denied both motions without an evidentiary hearing. During trial, Job requested

jury instructions on the lesser included offense of simple possession and on multiple conspiracies. The district court denied both requests. A jury convicted Job on all counts. The government sought enhanced penalties under 21 U.S.C. § 851 because Job had committed these offenses after prior felony convictions.

In determining Job's guidelines sentencing range, the district court applied three offense level increases: (1) a two-level increase for an offense involving the importation of methamphetamine under U.S.S.G. § 2D1.1(b)(5), (2) a two-level increase for maintaining a premises for the purpose of manufacturing or distributing a controlled substance under § 2D1.1(b)(12), and (3) a two-level increase for the unlawful discharge of a toxic substance under § 2D1.1(b)(13)(A). The district court also concluded that Job was subject to a 20-year mandatory minimum under 21 U.S.C. § 851. The court calculated a guidelines sentencing range of 360 months to life, and sentenced Job to 365 months in prison and supervised release for life.

## II. FOURTH AMENDMENT SEARCHES

Job challenges the constitutionality of three searches: (1) the search of his person on October 3, 2012, (2) the search of his car on October 3, 2012, and (3) the search of his home on December 5, 2012. We must determine whether the searches were unreasonable under the Fourth Amendment. We review a district court's denial of a motion to suppress evidence de novo and review the district court's factual findings for clear error. *United States v. Lara*, 815 F.3d 605, 608 (9th Cir. 2016) (citing *United States v. Mayer*, 560 F.3d 948, 956 (9th Cir. 2009)). Before turning to each search, we address the justification for the searches accepted by the district court.

In denying Job's motions to suppress, the district court concluded — based on our decision in *United States v. King* — that Job's Fourth Amendment search waiver provided a justification for all three searches. 736 F.3d 805, 810 (9th Cir. 2013). In *King*, we held that "a suspicionless search, conducted pursuant to a suspicionless-search condition of a violent felon's probation agreement, does not violate the Fourth Amendment." *Id*. The district court erred by applying *King*'s holding to this case.

It is undisputed that the officers were unaware of Job's Fourth Amendment search waiver when they stopped him and patted him down. The district court did not determine whether the officers were aware of the search waiver before conducting the search of his person and the search of his car. It based its decision solely on the fact that Job was subject to a Fourth Amendment search waiver at the time of the searches. Police officers must know about a probationer's Fourth Amendment search waiver before they conduct a search in order for the waiver to serve as a justification for the search. In *United States v. Caseres*, we concluded that a "search is not justified by the state's interest in supervising" parolees when the officers were unaware of the waiver before the search. 533 F.3d 1064, 1076 (9th Cir. 2008); *see also Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005) (holding that "police officers cannot retroactively justify a suspicionless search and arrest on the basis of an after-the-fact-discovery of . . . a parole [search waiver] condition"). This reasoning also logically applies to probationers, who have a higher expectation of privacy than parolees. *Lara*, 815 F.3d at 610 (citing *Samson v. California*, 547 U.S. 843, 850 (2006)). A Fourth Amendment search waiver cannot provide a justification for a search of a probationer where the officers were unaware of the waiver before they undertook the search. The district court erred in denying Job's motions

to suppress evidence from all three searches solely on the basis of Job's Fourth Amendment search waiver.

In addition, we note that the district court failed to recognize that our decision in *King* was limited to individuals on probation for violent felonies. 736 F.3d at 810; *see also Lara*, 815 F.3d at 609–10 (noting that *King* was "expressly limited" to violent felons and does not apply to individuals on probation for nonviolent drug crimes). Although the parties dispute whether Job was on probation for a felony or a misdemeanor, he was on probation for a nonviolent drug offense. **[2]** This fact may or may not have changed the district court's decision to deny Job's motion to suppress if it had undertaken the careful balancing test to determine whether the search at issue was reasonable under the Fourth Amendment, as alluded to in *King* and discussed in detail in *Lara*. *See Lara*, 815 F.3d at 609–12; *King*, 736 F.3d at 808–10. But the district court did not have the benefit of guidance from our decision in *Lara* at the time of its decision. The district court's decision to rely exclusively on *King*, however, was error.

The government now offers numerous, independent justifications for each search aside from the search waiver.

---

**[2]** At the time of the searches, Job was on probation for unlawful possession of a controlled substance, in violation of California Health and Safety Code § 11377(a). This offense is known as a "wobbler" because it can be punished as a misdemeanor or a felony. *United States v. Diaz-Argueta*, 564 F.3d 1047, 1049 (9th Cir. 2009); *see also People v. Morales*, 169 Cal. Rptr. 3d 814, 820 (Ct. App. 2014).

In *Lara*, we said that violations of California Health and Safety Code §§ 11378 and 11379(a), for the possession for sale and transportation of methamphetamine, are "nonviolent drug crime[s]." 815 F.3d at 610. Job was on probation for a similar offense, unlawful possession of methamphetamine, in violation of § 11377(a).

We address the government's other justifications for the searches, some of which are raised for the first time on appeal, because we can affirm on any ground supported in the record. *Recording Indus. Ass'n v. Diamond Multimedia Sys. Inc.*, 180 F.3d 1072, 1076 n.3 (9th Cir. 1999).

## A.  Search of Job's Person

The government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (citing *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)).  The government argues that the search and seizure of Job's person is justified (1) pursuant to Job's Fourth Amendment search waiver, (2) as a valid *Terry* stop and frisk, or (3) as a valid protective sweep.  As already discussed, Job's Fourth Amendment search waiver cannot provide a justification for the stop and search where officers were unaware of the waiver before the stop.

The government now argues, for the first time on appeal, that the initial stop and pat down were permitted under *Terry v. Ohio*, 392 U.S. 1 (1968).  *Terry* allows a "brief stop" where an officer has "reasonable suspicion to believe 'criminal activity may be afoot.'"  *Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016) (citing *Terry*, 392 U.S. at 30); *see also United States v. Crapser*, 472 F.3d 1141, 1147 (9th Cir. 2007).  After stopping an individual based on reasonable suspicion, an officer may also conduct a limited pat down, or frisk, if he believes that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *see also United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).

We review de novo whether a *Terry* stop was supported by reasonable suspicion. *Crapser*, 472 F.3d at 1145 (citing *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002)). Reasonable suspicion that a person is engaged in criminal activity "is formed by 'specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002) (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)). The police report offers the only evidence of the details regarding the events on October 3 because the district court did not hold an evidentiary hearing on the motion to suppress for the stop and subsequent searches.

In determining whether a stop was supported by reasonable suspicion, we consider the totality of the circumstances. *Thomas*, 863 F.2d at 625. It is unclear from the record: (1) whether the officers were at the scene to execute an arrest warrant for Richard Elliot, or to conduct a search pursuant to a Fourth Amendment search waiver at the home; (2) how many officers were at the scene; and (3) who owned the home at 2504 Snowdrop Street. From the record available, it appears that Officer Dedonato only observed: (1) Job at a location where the officers were conducting either an arrest of another person pursuant to a warrant or a search pursuant to another person's Fourth Amendment search waiver; (2) Job and Holt open the garage door as the police were arriving; (3) Job appear surprised and nervous; and (4) Job wearing baggy clothes, "with the pockets appearing to be full of items." These facts taken together do not support the conclusion that the officers had reasonable suspicion that Job was engaged in criminal activity.

We give "significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon" as evidence supporting reasonable suspicion to conduct a pat down. *United States v. Flatter*, 456 F.3d 1154, 1157 (9th Cir. 2006). But the facts that Job's pants appeared to be "full of items" and he appeared nervous do not support the conclusion that he was engaged in criminal activity. *See United States v. I.E.V.*, 705 F.3d 430, 438 (9th Cir. 2012) (noting that "mere nervous or fidgety conduct and touching of clothing" is not enough to establish reasonable suspicion). Testimony from the officers beyond what was in the police report might have bolstered the government's arguments that this stop was justified under *Terry*, but the government provided no other evidence, beyond the police report, in opposing Job's motion to suppress.

The record provides no information on the offense for which Elliot was arrested — for example, whether it was for a crime of violence — and whether there was reason for the officers to have been concerned that Job and Holt were engaged in similar activity or might pose a danger to them. *Dillard*, 818 F.3d at 878 (noting that "the type of crime a person is suspected of committing may be highly relevant" to the reasonable suspicion analysis). Nor does the police report state that Job made any furtive movements or appeared threatening, which would be relevant to our analysis. *Flatter*, 456 F.3d at 1158. Given the lack of information in the record, we conclude that the government has failed to meet its burden of establishing that the stop and the pat down were supported by reasonable suspicion.[3]

---

[3] The government argues that a pat down for the officers' safety was justified because the officers were serving a warrant "at dusk, only to

The government also raised a new justification for the pat down at oral argument, arguing that the stop was valid as a protective sweep under *Maryland v. Buie*, 494 U.S. 325 (1990), and that the subsequent search was valid under *Minnesota v. Dickerson*, 508 U.S. 366. We disagree. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327. The protective sweep is justified when the officers are effectuating "the arrest of a suspect in his home pursuant to an arrest warrant." *Id*. The government has not met its burden of proving that the officers were at the home pursuant to an arrest warrant, or that this was Richard Elliot's home. Moreover, the protective sweep would have been limited to a visual inspection for persons and would not have permitted the officers to conduct a pat down of Job. *Id.*

Because the government has failed to prove a justification for the warrantless stop and subsequent pat down, we conclude that the search of Job's person was unlawful. The evidence discovered during the pat down — a glass pipe and $1450 in cash — therefore should have been suppressed. *See United States v. Lustig*, 830 F.3d 1075, 1079 (9th Cir. 2016) (citing *Davis v. United States*, 564 U.S. 229, 236–37 (2011)).

---

have two unknown men (who might be [Elliot's] compatriots) suddenly open the garage at the target home as soon as police arrive." The officers would certainly be permitted to conduct a pat down if they reasonably believed that their "safety or that of others was in danger," but the pat down is permitted only if the initial stop itself was based on reasonable suspicion. *Thomas*, 863 F.2d at 628.

## B. Search of Job's Car

As noted, the government bears the burden of proving that a warrantless search of Job's car falls within an exception to the warrant requirement. *Scott*, 705 F.3d at 416. The government offers two alternative justifications for the search of Job's car: (1) the automobile exception or (2) the discovery of a valid Fourth Amendment search waiver. Both of these arguments fail.

The automobile exception allows the police to conduct "a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010). The government argues that the evidence of the glass pipe seized from Job's person gave the officers probable cause to believe that there was evidence of contraband in Job's car. We have already determined that the glass pipe was unlawfully seized, and it therefore follows that evidence derived from the discovery of the pipe would be impermissible fruits of the unlawful seizure. *United States v. Washington*, 490 F.3d 765, 776–77 (9th Cir. 2007). Because the government offers no other evidence to form probable cause to search Job's car, the automobile exception cannot justify the warrantless search of the car.

The government next argues that the discovery of the Fourth Amendment search waiver gave the officers a valid justification for the search. The police report suggests that the officers may have learned about the search waiver during a records check after the officers patted Job down, but before they searched his car. The district court made no finding on this fact, however, and Job argues that the record is at least unclear as to when the officers learned of Job's Fourth Amendment search waiver. We agree. As we noted above, a Fourth Amendment search waiver cannot provide a

justification for a search of a probationer where the officers were unaware of the waiver before they undertook the search. From this record, we cannot conclude that the government has proved by a preponderance of the evidence that the officers knew about the search waiver before searching Job's car. *See United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987).[4]

The government has failed to prove a valid justification for the search of Job's car. Therefore any evidence seized from the car — including the 3.9 grams of methamphetamine in baggies — should have been suppressed. *See Lustig*, 830 F.3d at 1080.

## C.  Search of Job's Home

We next determine whether the evidence seized from a search of Job's home on December 5 pursuant to a search warrant was reasonable under the Fourth Amendment. We review de novo the validity of a search warrant. *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013). On appeal, the government proposes three justifications for this search: (1) a valid search warrant, (2) Job's Fourth Amendment search waiver, or (3) the good faith exception to the exclusionary rule. Because we conclude that the search was conducted pursuant to a valid search warrant, we need not address the government's two alternative justifications.

Job argues that the affidavit in support of the search warrant provides an insufficient basis to establish probable

---

[4] In any event, the government conceded at oral argument that even if the officers knew of the existence of Job's Fourth Amendment search waiver, they did not know the terms of the waiver when they searched the car or that Job was in fact only a nonviolent probationer.

cause that evidence of methamphetamine trafficking would be found in his home. Specifically, he argues that (1) the warrant relied in part on the unlawful search of Job's person and his car on October 3; (2) the affidavit asserts that specific telephone numbers are "used by" individuals, but does not give factual support for those conclusions; and (3) the affidavit contains broad conclusions and editorializing by the affiant, Detective James Cady, that are not supported by underlying facts.[5] The government responds that the affidavit contains sufficient facts to establish probable cause. We agree.

We normally give "great deference" to a magistrate judge's finding that probable cause supports a warrant. *Underwood*, 725 F.3d at 1081 (citing *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011)). But Detective Cady's affidavit in support of the search warrant referenced the events on October 3 and the searches of Job's person and car, and we have concluded that those searches were unlawful. A search warrant is not "rendered invalid merely because some of the evidence included in the affidavit is tainted." *United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014) (citing *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994)). "The warrant remains valid if, after excising the tainted evidence, the affidavit's 'remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'" *Id.* (quoting *Reed*, 15 F.3d at 933). We make this "determination without the usual

---

[5] Although the affidavit includes no information about subscriber information or voice recognition for Job's phone number, his identity was corroborated when Brown-Rodriguez referred to him as Travis over the phone, and when officers observed him with Brown-Rodriguez in the parking lot 30 minutes after Brown-Rodriguez and Job discussed meeting.

deference owed to the magistrate's initial finding of probable cause."  *Id.* (citing *United States v. Kelley*, 482 F.3d 1047, 1051 (9th Cir. 2007)).  We therefore will excise the paragraphs that reference the unlawful searches and determine on our own whether the remaining portions of the affidavit support a finding of probable cause.

According to Detective Cady, the facts in the affidavit are derived from:  oral and written investigative reports, physical surveillance by law enforcement, a review of pen register data, statements by confidential sources, a review of telephone calls and text messages obtained through wiretapping of codefendant Robert Rodriguez and Brown-Rodriguez's telephones, and information from law enforcement databases.  The affidavit begins with statements that Robert Rodriguez and Carrie Brown-Rodriguez were involved in the distribution of methamphetamine.  The affidavit states that Job assisted Rodriguez and Brown-Rodriguez in "'cutting' methamphetamine that is then sold or fronted to others."  The warrant identifies Job, Rodriguez, and Brown-Rodriguez as individuals involved in the distribution of methamphetamine, and alleges that there is probable cause for a violation of conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 846.  The affidavit also lists Job's previous conviction in 2001 for conspiracy to distribute methamphetamine.

Job argues that the affidavit fails to establish probable cause because the affidavit does not provide sufficient facts to support Detective Cady's conclusion that Job is a narcotics trafficker.  Although the affidavit does not expressly assert that Job is a trafficker, the affidavit does provide facts to support the conclusion that Job was in the business of "buying and selling" methamphetamine. *Underwood*, 725 F.3d at 1083.  The affidavit includes

references to intercepts of conversations regarding a "business deal" between Rodriguez and Job. Job asks Brown-Rodriguez for "cuatro," and then states that he will "keep going somewhere else" because he has people "bugging" him. Detective Cady explains that Job is referring to four ounces of methamphetamine. For all of these intercepted phone calls and text messages, Detective Cady provides the participants, the date and time of the exchange, the phone number used, and the content of the conversations. The affidavit thus lays a sufficient foundation to establish probable cause that Job was involved in the distribution of drugs with Rodriguez. *See id.* at 1084.

Job also argues that the affidavit does not establish that evidence of methamphetamine trafficking would be found in his home. We have said, however, that "a magistrate is allowed to draw a reasonable inference that '[i]n the case of drug dealers, evidence is likely to be found where the dealers live.'" *United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004) (citing *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986)). Because Detective Cady's affidavit provides sufficient facts to support the conclusion that Job was involved in the distribution of drugs, the Court may draw the reasonable inference that evidence is likely to be found where Job lives. *Id.*

Some statements in the affidavit are Detective Cady's conclusions, interpretations of cryptic conversations, and interpretations of drug slang and coded terms. But there is sufficient information to establish probable cause to believe that Job, Rodriguez, and Brown-Rodriguez were engaged in drug trafficking together and that — at least at some point in the August/September timeframe — there was methamphetamine in Job's residence. Job argued in the district court, but not here, that this information was stale by

December 4, when the affidavit was signed and submitted to the magistrate judge.  Because Job did not pursue his staleness argument in this Court, we need not consider the reasonableness of the inference that drugs would be found in Job's home.

Despite some deficiencies in the affidavit, we conclude that after excising the references to the unlawful searches, the remaining portions of the affidavit established that there was a "fair probability that contraband or evidence of a crime" would be found in Job's home.  *United States v. Williams*, 846 F.3d 303, 312 (9th Cir. 2017) (citation omitted).  We conclude that the search of Job's home was lawful and that the evidence seized was admissible at trial.

## III.  THE EFFECT OF UNLAWFULLY SEIZED EVIDENCE ON THE JURY VERDICT

Having found that the district court erred in denying the motion to suppress the evidence found on Job's person and in his car on October 3, we must next determine whether that error was harmless.  A constitutional error, such as a failure to suppress evidence from a Fourth Amendment violation, is harmless only when it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  *Chapman v. California*, 386 U.S. 18, 24 (1967); *see United States v. Walters*, 309 F.3d 589, 593 (9th Cir. 2002).[6]  "Review for harmless error requires not only an evaluation of the remaining incriminating evidence in the

---

[6] The government misstates our standard of review for harmless error; the standard is not whether "a rational jury could . . . have found Job guilty" on both counts.  *See United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000) (noting "the harmlessness of an error is distinct from evaluating whether there is substantial evidence to support a verdict").

record, but also the most perceptive reflections as to the probabilities of the effect of [the] error on a reasonable trier of fact." *United States v. Bishop*, 264 F.3d 919, 927 (9th Cir. 2001) (quoting *United States v. Harrison*, 34 F.3d 886, 892 (9th Cir. 1994)). We "must be convinced that the improperly admitted evidence did not contribute to the verdict," *id.*, and the government bears the burden of showing the harmlessness of the error, *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005).

The jury convicted Job of conspiracy to distribute methamphetamine ("Count 1") and possession with intent to distribute methamphetamine ("Count 5"). The district court should have suppressed two key pieces of incriminating evidence: 3.9 grams of methamphetamine in baggies, which was found in Job's car on October 3, and $1450 in cash, which was found during the pat down on the same day. The government offered this evidence at trial as substantive evidence on both counts.

With regard to Count 1, the government argues that there was ample evidence — even without the fruits of the searches on October 3 — for a jury to convict Job of conspiracy to distribute methamphetamine. At trial, Brown-Rodriguez testified that she witnessed two meetings between Rodriguez and Job. She also testified that Rodriguez met with Job to give him methamphetamine because Job said that he "had someone waiting to get meth from him." In addition, Rodriguez and Job discussed a balance owed for methamphetamine that Rodriguez had provided, or fronted, to Job. Brown-Rodriguez's trial testimony also showed that Job cut methamphetamine for Rodriguez, which Brown-Rodriguez later sent to a dealer in South Carolina.

Job argues that none of this evidence shows that Job was involved in a larger conspiracy with Rodriguez and Brown-

Rodriguez to distribute drugs. At most, he argues, the evidence indicates that Job had a "buyer-seller" relationship with Rodriguez. *See United States v. Loveland*, 825 F.3d 555, 561 (9th Cir. 2016). Job also notes that in her trial testimony, Brown-Rodriguez failed to include Job as a member of Rodriguez's distribution conspiracy. When asked if she was aware of whether or not Rodriguez provided methamphetamine to Job with instructions to sell to others, Brown-Rodriguez responded, "I don't know."

Although the government offered evidence from the October 3 searches as evidence on both counts, the government provided substantial evidence of Job's involvement in the conspiracy that pre-dated the October 3 searches. The prosecutor referenced the events of October 3 only once in closing argument in regard to Count 1. Based on our review of the remaining evidence and the likely effect of the evidence on a reasonable trier of fact, we conclude beyond a reasonable doubt that the admission of the illegally seized evidence did not contribute to the verdict on Count 1 for conspiracy to distribute methamphetamine. The district court's failure to suppress the evidence therefore was harmless as to Count 1, and we affirm Job's conviction for conspiracy to distribute methamphetamine.

We reach a different conclusion as to Count 5 for possession with intent to distribute methamphetamine. At trial, Job asserted — as his principal defense — that the 56.4 grams of methamphetamine found in his freezer on December 5 was for personal use. The government presented evidence of distribution, such as the baggies and scales found in Job's home, to support its intent-to-distribute theory. But the government also relied on and explicitly invited the jury to consider the evidence from the October 3 searches — particularly the $1450 in cash and the 3.9 grams

of methamphetamine that should have been suppressed — as evidence of intent to distribute. Indeed, the prosecutor mentioned it three separate times in closing argument. During closing argument, the prosecutor stated:

> Travis Job walked around with over $1,400 in his [pockets]. That is what he had on October 3rd, when he had the multiple bags of methamphetamine. And that is an interesting point to keep up. When you're considering the [events of] October 3rd and whether or not [the methamphetamine possessed on December 5th] is personal use, the two bags of methamphetamine, know this, this scale in the I-Phone box that has these bags, tiny little bags right here, are the exact same type of bags that methamphetamine was packaged in that he was carrying around when he had his $1,400 on October 3rd, of 2012, when he was stopped and arrested.

The government correctly notes that the district court told the jury that the statements of counsel are not evidence, but the prosecutor's remarks in closing argument were a persistent reminder for the jury to consider the evidence of the seizures on October 3 as evidence of Job's possession with intent to distribute on December 5. Although there was other evidence to support Job's conviction for possession with intent to distribute, the large amount of cash and small quantities of methamphetamine seized on October 3 provided critical evidence to rebut Job's defense that the methamphetamine found in his freezer on December 5 was for his personal use and not for distribution. Based on the remaining incriminating evidence and the likelihood that the

jury considered the evidence explicitly mentioned several times in closing, we cannot conclude beyond a reasonable doubt that the evidence from the October 3 searches did not contribute to the jury's verdict on Count 5. We therefore vacate Job's conviction for possession with intent to distribute and remand for further proceedings.

## IV. JURY INSTRUCTIONS

At trial, Job requested two specific jury instructions, which the district court denied: an instruction on the lesser included offense of simple possession, with regard to Count 5, and an instruction on multiple conspiracies, with regard to Count 1. Because we vacate Job's conviction for possession with intent to distribute, we need not address the district court's denial of a jury instruction on the lesser included offense of simple possession. The issue can be raised again in the district court if the government chooses to retry Job on the charge of possession with intent to distribute.

"A multiple conspiracies instruction is required only if the defendants' theory of the charged conspiracy or conspiracies 'is supported by law and has some foundation in the evidence.'" *Fernandez*, 388 F.3d at 1247 (quoting *United States v. Anguiano*, 873 F.3d 1314, 1317 (9th Cir. 1989)). We have not been entirely consistent on whether to apply an abuse of discretion or de novo standard of review in reviewing the district court's refusal to give a multiple conspiracies instruction when the parties dispute whether there was sufficient evidence to support such an instruction. *Compare United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (quoting *United States v. Bello-Bahena*, 411 F.3d 1083, 1089 (9th Cir. 2005)) ("Where the parties dispute whether the evidence supports a proposed instruction, we review a district court's rejection of the instruction for an abuse of discretion."), *with Anguiano*, 873 F.2d at 1317

("[T]he issue of whether the evidence was sufficient to support the giving of a multiple conspiracies instruction should be subject to *de novo* review."). Because we conclude that the district court did not err in refusing to give a multiple conspiracies instruction under either standard of review, we need not resolve that conflict here.

"Evidence sufficient to support a multiple conspiracies instruction is present where a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *Mincoff*, 574 F.3d at 1196 (quoting *Fernandez*, 388 F.3d at 1247). That is not the case here. Even though Brown-Rodriguez did not identify Job at trial as part of the distribution ring, there was evidence before the jury that Rodriguez fronted drugs to Job. Brown-Rodriguez testified that she witnessed Rodriguez and Job meet in a hotel after Job "told Robert that he had someone waiting to get meth from him." She also testified that Rodriguez provided Job with methamphetamine. Job then left the hotel "to go meet the person he was talking about" and returned an hour later. At trial, the government also introduced a recording of an intercepted phone call between Rodriguez and Brown-Rodriguez, in which the two discuss Job's balance for fronted methamphetamine.

Brown-Rodriguez also testified that Rodriguez hired Job to cut methamphetamine for her and Rodriguez. The evidence at trial also indicates that Job was aware that the methamphetamine he cut was distributed to others. Brown-Rodriguez testified that she would mail cut methamphetamine to a dealer in South Carolina. The government introduced text messages between Brown-Rodriguez and Job, in which they discussed when he would deliver the cut methamphetamine. In one of these messages,

Job writes, "I can get you the four [ounces] to finish the mail." These text messages indicate that Job was aware that Brown-Rodriguez intended to mail the methamphetamine he cut for her. In addition, cutting methamphetamine has a direct relationship to the quantity of drugs that can be sold and therefore the amount of profits to be gained in a conspiracy to distribute methamphetamine. *See, e.g.*, *United States v. Chavez-Alvarez*, 594 F.3d 1062, 1064 (8th Cir. 2010); *United States v. Castro*, 908 F.2d 85, 88 (6th Cir. 1990) (citation omitted). On the basis of the direct and circumstantial evidence at trial, we conclude that no reasonable jury could reasonably find Job's cutting of methamphetamine was a conspiracy separate from or unrelated to the overall conspiracy to distribute charged in the indictment.

Although a single conspiracy can include "several subagreements or subgroups of conspirators," *Fernandez*, 388 F.3d at 1248 n.34 (citing *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984)), that does not mean there are separate conspiracies. The evidence presented at trial perhaps shows a subagreement to cut methamphetamine, but that subagreement is not "separate" from and "unrelated" to the overall conspiracy to distribute charged in Count 1. Job cut methamphetamine for Rodriguez and Brown-Rodriguez and was aware that the methamphetamine he cut was distributed to others. Thus, his activity was a part of the distribution conspiracy charged in the indictment. Based on the evidence in the record, we conclude that the district court did not err in refusing to give a multiple conspiracies instruction under either an abuse of discretion or a de novo standard of review.

## V.  SENTENCING ISSUES

We review de novo whether a district court complied with Rule 32 of the Federal Rules of Criminal Procedure in making its determinations at sentencing.  We review a district court's interpretation of the Sentencing Guidelines de novo and review its factual findings for clear error. *United States v. Doe*, 778 F.3d 814, 821 (9th Cir. 2015); *United States v. Carter*, 219 F.3d 863, 866 (9th Cir. 2000). The government bears the burden of proving facts that support a sentencing adjustment by a preponderance of the evidence. *United States v. Romero-Rendon*, 220 F.3d 1159, 1160 (9th Cir. 2000).

In its presentence investigation report, the probation office recommended three increases to the base offense level of Job's guidelines sentencing range as follows:  (1) two levels for an offense involving the importation of methamphetamine under U.S.S.G. § 2D1.1(b)(5), (2) two levels for an offense in which the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance under § 2D1.1(b)(12), and (3) two levels for an offense involving an unlawful discharge of a toxic substance under § 2D1.1(b)(13)(A).  In applying the three offense level increases recommended by the probation office and requested by the government, the district court stated:

> There is no doubt, based on the evidence I heard, that [Job] was in the importing of methamphetamine, and the methamphetamine was coming from Mexico and was being given to him to cut and process.  I have no doubt that that two-level increase should apply.  I also don't have any doubt with regards to the finding that he

> was maintaining the premises for the manufacturing and distribution of a controlled substance. I have no problems with that. I have no problems with the fact that there was an unlawful discharge of a toxic substance unless we're prepared to assume that methamphetamine is not a toxic substance.

The district court then increased Job's base offense level from 34 to an offense level of 40; with a criminal history category V, Job's guidelines sentencing range was 360 months to life. The district court also concluded that Job was subject to a 20-year mandatory minimum under 21 U.S.C. § 851.[7]     The court imposed a sentence of 365 months' imprisonment and supervised release for life.

## A.  Sufficiency of District Court's Findings at Sentencing

In his sentencing memorandum to the district court, Job argued that there was insufficient evidence to support the offense level increases. He argued that (1) there was no evidence that he was personally involved in the importation of methamphetamine, (2) there was no evidence that he had

---

[7] Job argues that 21 U.S.C. § 851 violates the Sixth Amendment because the sentencing enhancement scheme increases his mandatory minimum based on a fact that has not been decided by a jury. Current Ninth Circuit and Supreme Court precedent foreclose this argument. *See Almendarez-Torres v. United States*, 523 U.S. 224, 247 (1998) (holding that the fact of a prior conviction is a sentencing factor and not an element of the offense that must be decided by a jury); *United States v. Leyva-Martinez*, 632 F.3d 568, 569 (9th Cir. 2011) (per curiam) (noting that we have "repeatedly held . . . that *Almendarez-Torres* is binding unless it is expressly overruled by the Supreme Court").

chemicals to manufacture methamphetamine in his home, and (3) "the underlying foundation for the discharge of toxic substances was never produced to the court." Therefore, the burden was on the government to prove the facts to support these increases by a preponderance of the evidence. *Romero-Rendon*, 220 F.3d at 1160. Job argues on appeal that the government failed to do so and that it is difficult to discern from the district court's statements at sentencing its reasoning or on which facts it relied in applying these increases. We agree.

When a defendant makes specific objections to the presentence investigation report, as Job did here, the district court must follow the procedures set forth in Rule 32 of the Federal Rules of Criminal Procedure. *United States v. Doe*, 705 F.3d 1134, 1153 (9th Cir. 2013); *United States v. Ingham*, 486 F.3d 1068, 1073–74 (9th Cir. 2007). Rule 32 states that the district court "must — for any disputed portion of the presentence report or other controverted matter — rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). We mandate "strict compliance" with Rule 32. *Doe*, 705 F.3d at 1153 (quoting *United States v. Houston*, 217 F.3d 1204, 1208 (9th Cir. 2000)). In the context of Rule 32, a ruling on a dispute is an "explicit factual finding that resolves the dispute." *Carter*, 219 F.3d at 867; *see also Doe*, 705 F.3d at 1153 (citation and internal quotation marks omitted) (noting that rulings must be "express or explicit"). Rule 32 findings "need not be detailed and lengthy," but they must "state the court's resolution of the disputed issues." *Ingham*, 486 F.3d at 1074 (citing *United States v. Karterman*, 60 F.3d 576, 583 (9th Cir. 1995)). We turn now to whether the statements made

by the district court were explicit findings adequate under Rule 32 to resolve the three disputed issues.

In regard to the importation of methamphetamine under U.S.S.G. § 2D1.1(b)(5), the district court made three factual findings based on the evidence at trial: (1) Job was "in the importing of methamphetamine," (2) "the methamphetamine was coming from Mexico," and (3) the methamphetamine was "being given to him to cut and process." The district court's first finding is the only finding that addresses Job's objection about whether he was involved in the importation. Although this finding does rule on the objection, the district court's finding was clear error because the government offered no evidence — at trial or at sentencing — that Job was personally involved in the importation of methamphetamine. *See United States v. Pineda-Doval*, 692 F.3d 942, 944 (9th Cir. 2012) (quoting *Red Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1087 (9th Cir. 2011)) (noting that a factual finding is clearly erroneous if it is "without support in inferences that may be drawn from the facts in the record").

With respect to the increase under U.S.S.G. § 2D1.1(b)(12) for maintaining a premises for the purpose of manufacturing or distributing methamphetamine, the district court stated that it did not "have any doubt with regards to the finding that [Job] was maintaining the premises for the manufacturing and distribution of a controlled substance." This statement does not explicitly rule on Job's objection that he did not have any chemicals to manufacture methamphetamine in his home. Although the probation office offered support for its conclusion that the offense level increase applied — which may be the finding the court referred to here — the district court "may accept the presentence report as its findings of fact, but only after it has

resolved all objections." *United States v. Standard*, 207 F.3d 1136, 1142 (9th Cir. 2000). Further, we have previously rejected arguments that a district court complies with Rule 32(i)(3)(B) when it makes a finding that an increase should apply but nevertheless fails to rule on a factual dispute underlying the increase. *See Carter*, 219 F.3d at 867.

As for the last two-level increase for an offense involving the unlawful discharge of a toxic substance under U.S.S.G. § 2D1.1(b)(13)(A), the district court similarly applied the increase without ruling on Job's objection that the government had not provided a factual basis for it. The district court cited no evidence — produced by the government at trial or at sentencing — for this increase, saying only that it had "no problems with the fact that there was an unlawful discharge of a toxic substance unless we're prepared to assume that methamphetamine is not a toxic substance." Because the district court's ruling was not express or explicit, it was insufficient to comply with our interpretation of Rule 32. *Doe*, 705 F.3d at 1153.

On appeal, the government invites us to conduct our own factual inquiry to determine whether there were sufficient facts in the record to support these three offense level increases. But such determinations are fact-intensive inquiries better suited for the district court. Further, "it is well settled law in this circuit that when the district court fails to make the required Rule 32 findings or determinations at the time of sentencing, we must vacate the sentence and remand for resentencing." *Ingham*, 486 F.3d at 1074 (quoting *Carter*, 219 F.3d at 866).

Although we vacate Job's sentence on both counts for failure to comply with Rule 32, we address Job's arguments with respect to the offense level increases at sentencing because these issues are likely to arise again at resentencing,

regardless of whether there is a new trial on Count 5. We do not address the issue of whether Job's sentence was substantively unreasonable.

## B. Importation of Methamphetamine Under U.S.S.G. § 2D1.1(b)(5)

U.S.S.G. § 2D1.1(b)(5) allows for a two-level increase if "the offense involved the importation of . . . methamphetamine or the manufacture of . . . methamphetamine from listed chemicals that the defendant knew were imported unlawfully." § 2D1.1(b)(5). As noted above, the district court erroneously found that Job was personally involved "in the importing of methamphetamine."

The evidence at trial showed that Job's codefendant Robert Rodriguez imported methamphetamine from Mexico. Rodriguez was charged with and convicted of conspiracy to import methamphetamine, in violation of 21 U.S.C. §§ 952, 960(b)(1)(H), 963. Job was not charged with that conspiracy, but with a separate conspiracy to distribute methamphetamine. At trial, the government provided no evidence that Job was personally involved in the importation of methamphetamine. At sentencing, the government therefore asked for this two-level increase through relevant conduct related to jointly undertaken criminal activity under U.S.S.G. § 1B1.3(a)(1)(B) — presumably the jointly undertaken activity between Job and Rodriguez. If Job was not personally involved in the importation, the increase could apply only if the district court determined that the importation was "within the scope of jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity" under § 1B1.3(a)(1)(B). The district court made no factual

findings or determinations with respect to this argument at Job's sentencing hearing.

On appeal, the government argues that § 2D1.1(b)(5) of the Sentencing Guidelines can be imposed on a strict liability basis so long as the government proves that the drugs were imported by someone — and regardless of the defendant's intent, knowledge, or lack of knowledge that the drugs were imported. Relying on *United States v. Biao Huang*, 687 F.3d 1197 (9th Cir. 2012), the government argues that it need only prove that the drugs were imported by someone where a defendant was not personally involved in the importation and there is no evidence that he had actual knowledge of the importation.

In *Biao Huang*, relying on the plain language of the Guidelines, we rejected the argument that U.S.S.G. § 2D1.1(b)(5) requires the government to show that the defendant himself personally imported the drugs. 687 F.3d at 1205–06. In contrast to other increases that do require that the defendant himself import drugs or be "directly involved" in the importation, § 2D1.1(b)(5) only requires that the offense charged involve importation by someone, not necessarily the defendant. *Id*. at 1205. Hence our statement that "a defendant need not be personally involved in the importation of illegal drugs to receive an [increase] under § 2D1.1(b)(5); it is enough for the government to show that the drugs were imported." *Id.* at 1206. We also said in *Biao Huang*, however, that whether § 2D.1.1(b)(5) requires the defendant to actually know that the methamphetamine he sold was imported by someone is "an open question." *Id*.

Only one circuit has approved the government's proffered reading of U.S.S.G. § 2D1.1(b)(5) that would dispense with the requirement that the defendant actually know the drugs were imported. In *United States v. Serfass*,

the Fifth Circuit stated that the plain language of § 2D1.1(b)(5) supports the conclusion that the increase applies to "a defendant who possesses methamphetamine that had itself been unlawfully imported" regardless of whether he or she had actual knowledge of the importation. 684 F.3d 548, 553 (5th Cir. 2012). We decline to adopt the Fifth Circuit's conclusion here — particularly where the government never advanced this argument in the district court and sought to apply the increase only on the basis of jointly undertaken criminal activity under U.S.S.G. § 1B1.3, and the district court made no determinations about the scope of the jointly undertaken criminal activity as required by the Sentencing Guidelines.

### C.  Maintaining a Premises for the Purpose of Manufacturing or Distributing Methamphetamine Under U.S.S.G. § 2D1.1(b)(12)

A two-level increase under U.S.S.G. § 2D1.1(b)(12) applies "to a defendant who knowingly maintains a premises," which can be a single room, "for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1 cmt. n.17. The application note also states that manufacturing or distributing methamphetamine must be "one of the defendant's primary or principal uses for the premises." *Id.* To make that determination, the district court "should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." *Id.*

To support this increase, the government offered photographs of Job's apartment, which had been admitted at trial, and a report by the San Diego County Department of Environmental Health, issued after an inspection of Job's apartment. The report by the Department of Environmental

Health states that it is "unknown" whether methamphetamine manufacturing occurred in Job's apartment because "law enforcement removed the chemical containers prior to [the inspector's] arrival."  The government argues that "the [district] court could certainly have found it more likely than not that one of the primary uses of the downstairs kitchen was to manufacture or distribute drugs."  As evidence that a primary purpose of the kitchen was to manufacture methamphetamine, the government notes that the kitchen cabinets lacked food and drink, but included a microwave and a hot plate, which are commonly used to cut methamphetamine.  Job argues that there is no evidence to support the conclusion that Job maintained the premises for the primary purpose of either manufacturing or distributing methamphetamine.

From the statements made by the district court at sentencing, it does not appear that the court considered whether or not one of the primary purposes of Job's kitchen was to manufacture methamphetamine.  It also is not clear what the factual basis was for the court's statement that it had no doubt "with regards to the finding that he was maintaining the premises for the manufacturing and distribution of a controlled substance."  Further, the report by the Department of Environmental Health is inconclusive as to whether manufacturing was taking place at Job's home. The report indicates only that methamphetamine had been stored in Job's kitchen and living room.  Job also argues that there was no evidence at trial or at sentencing that he ever distributed methamphetamine out of his home.  Without any findings of fact from the district court, we conclude that the government has not met its burden of proving by a preponderance of the evidence that Job maintained a premises for the primary purpose of manufacturing or distributing methamphetamine.

### D. Unlawful Discharge of a Toxic Substance Under
### U.S.S.G. § 2D1.1(b)(13)(A)

The district court applied an increase for the unlawful discharge of a toxic substance under U.S.S.G. § 2D1.1(b)(13)(A). As the government acknowledges, the district court appears to have based its decision on a belief that methamphetamine is by itself a toxic substance, but it made no factual findings. An increase under § 2D1.1(b)(13)(A) applies to conduct that involves "any discharge, emission, release, transportation, treatment, storage, or disposal violation covered by the Resource Conservation and Recovery Act, 42 U.S.C. § 6928(d); the Federal Water Pollution Control Act, 33 U.S.C. § 1319(c); the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9603(b); or 49 U.S.C. § 5124." U.S.S.G. § 2D1.1 cmt. n.18.

Although no violation of these statutes was discussed — let alone proved — at sentencing, the government argues that we may find factual support for this increase in the Department of Environmental Health's report, which indicated that the chemicals acetone, methanol, glycerol, and ethanol were found in Job's garage. The government maintains that acetone and methanol are both "per se 'hazardous wastes'" covered by the Resource Conservation and Recovery Act, and therefore can be the basis for this increase. Although the Environmental Protection Agency has designated acetone and methanol as hazardous wastes, the government presented no evidence at sentencing regarding the form, quantity, or storage of these substances. *See* Protection of the Environment, 40 C.F.R. § 261.33 (2016). Therefore, we conclude that the government did not meet its burden of proving the facts necessary to support the

increase under U.S.S.G. § 2D1.1(b)(13)(A) by a preponderance of the evidence.

## VI.  CONCLUSION

The district court erred in denying Job's motion to suppress the evidence discovered during the unlawful searches of Job's person and car.  That error was harmless with respect to Job's conviction for conspiracy to distribute methamphetamine, and we therefore AFFIRM his conviction on Count 1.  We do not reach the same conclusion with respect to Job's conviction for possession with intent to distribute; we therefore VACATE his conviction on Count 5 and REMAND for further proceedings consistent with this opinion, including a possible retrial on that count.  We VACATE his sentence on both counts and REMAND for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**